John HARRIS, Jr., Jim Dan, Diane Hirsch, and Farrel Broslawsky, Plaintiffs,

v.

Evelle J. YOUNGER, Defendant.

No. 67-1041-WPG.

United States District Court
C. D. California.

March 11, 1968.

---

Frank S. Pestana, Hollywood, Cal., A. L. Wirin, Fred Okrand, Los Angeles, Cal., for plaintiffs.

Evelle J. Younger, Dist. Atty., Patrick T. McCormick, Deputy Dist. Atty., Los Angeles, Cal., for defendant.

Before JERTBERG, Circuit Judge, and GRAY and FERGUSON, District Judges.

WILLIAM P. GRAY, District Judge.

The plaintiffs in this action challenge California's Criminal Syndicalism Act (the Act), which was first adopted by the legislature in 1919 and constitutes sections 11400–11402 of the Penal Code of that state.[1] It is urged in the com-

---

1. "§ 11400. *Definition*

"'Criminal syndicalism' as used in this article means any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change."

"§ 11401. *Offense; punishment*

plaint that the Act is unconstitutional on its face as being in violation of the First and Fourteenth Amendments of the United States Constitution, and this three judge court is asked to enjoin its enforcement.

As the previously indicated footnote discloses, section 11400 defines criminal syndicalism as meaning " * * * any doctrine * * * teaching or aiding and abetting the commission of crime * * * or unlawful acts of force and violence or * * * terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change."

Section 11401 provides that any person who teaches or aids or publicizes or justifies or commits any act of criminal syndicalism is guilty of a felony. The specific provisions of the five subdivisions of section 11401 will be discussed later in this opinion.

According to the complaint, plaintiff Harris has been indicted for having distributed certain leaflets in violation of the Act, and his prosecution is pending in the Los Angeles County Superior Court. Plaintiffs Dan and Hirsch allege that they are members of the Progressive Labor Party, which advocates change in industrial ownership and political change, and that they feel inhibited in advocating the program of their political party through peaceful, non-violent means, because of the presence of the Act "on the books", and because of the pending criminal prosecution against Harris. Plaintiff Broslawsky is a history instructor, and he alleges that he is uncertain as to whether his normal practice of teaching his students about the doctrines of Karl Marx and reading from the Communist Manifesto and other revolutionary works may subject him to prosecution for violation of the Act.

It is the contention of the plaintiffs that the pending prosecution and the prospect of future enforcement of the Act constitute their being subjected to deprivation of constitutional rights under color of that statute, within the meaning of 42 U.S.C. § 1983.

The respondent, who is the District Attorney of Los Angeles County, acknowledges that the prosecution of plaintiff Harris is pending; but he denies that the Act is unconstitutional on its face, or at all, and he therefore moves that the

"Any person who:

"1. By spoken or written words or personal conduct advocates, teaches or aids and abets criminal syndicalism or the duty, necessity or propriety of committing crime, sabotage, violence or any unlawful method of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

"2. Wilfully and deliberately by spoken or written words justifies or attempts to justify criminal syndicalism or the commission or attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to approve, advocate or further the doctrine of criminal syndicalism; or

"3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any other form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, criminal syndicalism; or

"4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism; or

"5. Wilfully by personal act or conduct, practices or commits any act advised, advocated, taught or aided and abetted by the doctrine or precept of criminal syndicalism, with intent to accomplish a change in industrial ownership or control, or effecting any political change;

"Is guilty of a felony and punishable by imprisonment in the state prison not less than one nor more than 14 years."

"§ 11402. *Partial invalidity*

"If for any reason any section, clause or provision of this article shall by any court be held unconstitutional, the Legislature hereby declares that, irrespective of the unconstitutionality so determined of such section, clause or provision, it would have enacted and made the law of this State all other sections, clauses and provisions of this article."

plaintiffs' petition for injunction be dismissed.

■ This case inherently involves the question of whether the Act does unconstitutionally abridge free expression or tend to discourage activities in which a person should be free to engage. Under such circumstances, it becomes the duty of this court to undertake to resolve these questions. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

We think that it would be preferable for the California courts to have the first opportunity to consider how the challenged statute squares with the First and Fourteenth Amendments. Those courts are just as able to perform this task as are we, and they regularly have shown full alertness to accept and be governed by the constitutional interpretations that are enunciated by the Supreme Court. An excellent example of this is the recent decision of the California Supreme Court in Vogel v. County of Los Angeles, 68 A.C. 12, 64 Cal.Rptr. 409, 434 P.2d 961 (1967), which has particular relevance to the issue here at hand.

However, it appears from the pleadings that plaintiff Harris sought unsuccessfully in the California Superior Court a dismissal of the indictment against him on the ground of the unconstitutionality of the Act. He then petitioned for writs of prohibition in the California Court of Appeal and the California Supreme Court to prevent the trial of the pending criminal action; such petitions were denied without opinion and without hearing, respectively. Certainly, it cannot be said that the plaintiffs ignored the state courts in seeking to assert their constitutional claims, although they presumably would have had a right to do so and come directly here. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

■ Of course, the unconstitutionality of the Act might be challenged as a defense by Harris at his trial, and on appeal if conviction ensues. And it has been held that, under normal circumstances, a federal court should not interfere with state criminal proceedings, even though constitutional issues may be involved therein, inasmuch as such questions may be reviewed by the United States Supreme Court on appeal. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). Cf. Beal v. Missouri Pac. R. Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941).

However, in recent years, exceptions to this rule have been applied when the criminal statute inherently has a limiting effect upon free expression and when, as here, it is susceptible to unduly broad application. Thus in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Supreme Court reversed the decision of a three judge court that it should abstain from entertaining an action to enjoin certain state criminal prosecutions. In the course of the opinion of the Court, Mr. Justice Brennan stated:

"A criminal prosecution under a statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms. See, e. g., Smith v. [People of the State of] California, 361 U.S. 147. [80 S.Ct. 215, 4 L.Ed.2d 205.] When the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. See Baggett v. Bullitt, supra [377 U.S.,] at 379 [84 S.Ct., at 1326, 12 L.Ed.2d, at 389]. For '[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions. * * *' NAACP v. Button, 371 U.S. 415, 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418.] Because of the sensitive nature of constitutionally protected ex-

pression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights —might be the loser." (380 U.S. at 486, 85 S.Ct. at 1120.)

The opinion then went on to state the rule that "We hold the abstention doctrine is inappropriate for cases such as the present one where * * * statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities." (380 U.S. at 489–490, 85 S.Ct. at 1122).

The same rule is reasserted in Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The opinion of the Court, by Mr. Justice Brennan, observed that when a plaintiff has filed a federal action claiming relief under the First Amendment, to require him " * * * to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." (389 U.S. at 252, 88 S.Ct. at 397.)

It follows that in the present case we may not abstain if the challenged statute unconstitutionally abridges free expression. We believe that it does, and our reasons are set forth in the balance of this opinion.

We are confronted at the outset with the facts that in Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), the Act was specifically upheld as not being repugnant to the First and Fourteenth Amendments, and that *Whitney* never has been specifically overruled. It is the respondent's principal contention that we therefore are bound by that decision.

 Certainly, we are obliged to follow a square holding by the Supreme Court, so long as it appears to constitute an expression of the Court's current interpretation of the law. But a decision may be overruled simply by being by-passed and ignored, as well as by being denounced specifically, and we are mindful that, under the leadership of the Supreme Court, constitutional concepts of freedom of expression have been refined and broadened a great deal since 1927, when *Whitney* was decided. We therefore have found it necessary to consider how the provisions of the Act and the opinion in *Whitney* square with the more recent holdings by the Supreme Court and expressions from its opinions. The results of our study convince us that neither the Act nor *Whitney* survives this test.

 The opinion in *Whitney* ruled that the Act was not unduly vague and uncertain as to its application. In arriving at such conclusion, the Court, speaking through Mr. Justice Sanford, tested the provisions of the Act by comparing them with other statutes that involved economic regulation, and which had survived constitutional attack. However, since *Whitney* we have learned that statutes seeking to regulate in the area of the First Amendment are held to a more stringent standard of clarity and precision than is required of statutes that undertake to lay down rules for the market place. See Ware v. Nichols, 266 F. Supp. 564, 568 (N.D.Miss.1967). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963).

The reason for this rule was clearly expressed in Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The Court there was concerned with a statutory requirement that obliged teachers employed by the state to swear, in effect, that they were not in violation of a statute whose provisions had substantially identical counterparts in the Act here involved. The Court held the statutory provisions invalid on their face as being unconstitutionally vague, and,

in the course of the opinion, Mr. Justice White stated:

"Those with a conscientious regard for what they solemnly swear or affirm, sensitive to the perils posed by the oath's indefinite language, avoid the risk of loss of employment, and perhaps profession, only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." (377 U.S. at 372–373, 84 S.Ct. at 1323.)

This statement must apply at least as strongly with respect to people who desire to remain carefully within the law and therefore keep their comments and activities within safe bounds in order to avoid all risk or threat of prosecution. First Amendment freedoms "* * * are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (1963).

■■ Therefore, despite *Whitney*, we must consider again whether the Act is impermissibly vague and overbroad. In undertaking this task, we are obliged to be mindful of another recently established principle. Under normal circumstances, a court should not consider a constitutional attack upon a statute on any basis that goes beyond the impending or probable application of such statute to the challenger. United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). However, "* * * the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application" to which the Court adverted in *Button* (371 U.S. at 433, 83 S.Ct. at 338), has brought about an exception to that rule. When such a statute is involved, we are obliged to consider it as a whole, irrespective of its limited applicability to the parties challenging it, and irrespective of whether a statute may be drawn with the requisite narrow specificity that would apply

to them. This rule is clearly stated in Dombrowski v. Pfister, and the following reason given therefor:

"If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. *Cf. Ex parte Young, supra,* [209 U.S.], at 147–148 [28 S.Ct., at 448–449, 52 L.Ed., at 723, 724.] By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." (380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22, 29 (1965)).

Bearing in mind these principles, we now examine the things that are proscribed by section 11401 of the Act by making their commission a felony.

*Sub-section 1* would include within its condemnation "Any person who * * * advocates, teaches or aids and abets criminal syndicalism or the * * * propriety of committing * * * violence * * * as a means of * * * effecting any political change."

In the first place, inasmuch as *advocacy* of criminal syndicalism is separately prohibited, it would appear that a person who teaches *about* criminal syndicalism without advocating it may be included within the Act. A person lecturing on the Communist Manifesto or our own Revolutionary War would be teaching about violence as a means of effecting political change. It may be presumed that the legislature did not intend to make such conduct a crime; but where

is the line to be drawn? This very uncertainty in the use of the words "advocate" and "teach" was noted by the Supreme Court as a reason for declaring unconstitutional the statute involved in Keyishian v. Board of Regents, 385 U.S. 589, 600, 87 S.Ct. 675, 682, 17 L.Ed.2d 629, 639 (1967).

> "* * * where a statute is so vague and uncertain as to make criminal an utterance or an act which may be innocently said or done with no intent to induce resort to violence or on the other hand may be said or done with a purpose violently to subvert government, a conviction under such a law cannot be sustained." See Herndon v. Lowry, 301 U.S. 242, 259, 57 S.Ct. 732, 739, 81 L.Ed. 1066, 1075 (1937).

Even if the Act were to be construed as including only the type of teaching that involves advocacy, it still is overbroad in its prohibition, because the advocacy condemned is not limited to the "Action now!!" variety.

> "[E]ven advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind." See Whitney v. People of State of California, 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, 1106 (1927), concurring opinion by Mr. Justice Brandeis.

Again, in Noto v. United States, 367 U.S. 290, 297–298, 81 S.Ct. 1517, 1521, 6 L.Ed.2d 836, 841 (1961), we are instructed that:

> "* * * the mere abstract teaching of Communist theory, including the teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action. There

must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise ambiguous theoretical material regarding Communist Party teaching, * * *."

See also Yates v. United States, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356, 1371–1372 (1957). The doctrine here attributed to *Noto* and *Yates* was asserted by Mr. Justice Harlan in those opinions as a reason for reversing convictions under the Smith Act (18 U.S.C. § 2385), which provides for punishment of one who "* * * knowingly or willfully advocates * * * or teaches the * * * propriety * * *" of violent overthrow of government. We are mindful that the Court there was content to interpret those provisions as being limited to incitement and did not question their constitutionality; and we are mindful also that the Smith Act was upheld in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). However, we believe that we are bound by the later case of Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), which held unconstitutional on its face, as being fatally vague, a statute that made ineligible for employment as a teacher a person who "* * * wilfully and deliberately advocates * * * or teaches the doctrine * * *" of violent overthrow. One of the bases of the decision was that "The teacher cannot know the extent, if any, to which a 'seditious' utterance must transcend mere statement about abstract doctrine, the extent to which it must be intended to and tend to indoctrinate or incite to action in furtherance of the defined doctrine." (385 U.S. at 599, 87 S.Ct. at 681).

To *abet* criminal syndicalism is also made a crime by sub-section 1. What constitutes such abetting? Presumably, it might include assisting in the conduct of a meeting called under the auspices of an organization advocating criminal syndicalism, irrespective of the purpose

of the meeting. But a prosecution for just such an offense was reversed as an unconstitutional curtailment of free speech and assembly in De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937), in an opinion written by Mr. Chief Justice Hughes.

*Abetting* would necessarily include lending "aid" or "support" or "advice" or "counsel" or "influence" in further-ance of criminal syndicalism. These very words in an oath requirement statute were held, in Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961), to require applica-tion of the principle that

" * * * a statute which either for-bids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its appli-cation, violates the first essential of due process of law." Connally v. Gen-eral Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926).

Sub-section 1 clearly fails to meet the standards of constitutionality disclosed by the foregoing authorities.

*Sub-section 2* would punish anyone who "Wilfully and deliberately * * * at-tempts to justify criminal syndicalism * * *." The conduct here prohibited would cover mere expression of belief or philosophy. It does not even reach the general level of potential danger occupied by abstract advocacy of violent over-throw. The assertion of doctrinal justi-fication of criminal syndicalism, or of any other doctrine, however repulsive or unpatriotic, falls clearly within the protection of the First and Fourteenth Amendments, and such conduct may not be proscribed by statute. Cf. Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961). This con-clusion is also required by all of the other authorities cited in our discussion with respect to sub-section 1 of the Act.

*Sub-section 3* of the Act condemns as a violator a person who "Prints, publishes * * * circulates or publicly displays any * * * paper * * * containing * * * teaching * * * of * * * criminal syndicalism." In our discussion of sub-section 1, we have pointed out how it is that a statute that seeks to punish one who *teaches* criminal syndicalism is rendered void by the First Amendment. If the *teacher* cannot be punished, it follows that the person that prints the paper containing the writings of the teacher, the magazine editor that pub-lishes it, the sidewalk vendor that sells it, and the librarian that publicly displays it—all are similarly protected by the Constitution. And yet, it is hard to see how the Act could be interpreted without making all of such people subject to prosecution.

"The greater the importance of safe-guarding the community from incite-ments to the overthrow of our insti-tutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assem-bly in order to maintain the opportun-ity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional govern-ment." De Jonge v. State of Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278, 284 (1937).

Sub-section 3 completely overlooks this principle. Cf. Keyishian v. Board of Regents, 385 U.S. 589, 601, 87 S.Ct. 675, 682–683, 17 L.Ed.2d 629, 639 (1967).

*Sub-section 4* would make it unlawful to assist in organizing or knowingly be a member of any organization formed to teach or abet criminal syndicalism. Here, the envisaged danger to the public is even farther removed than that with which sub-section 1 attempted to deal. For while the latter-mentioned provision of the Act would prosecute a person who *already* has preached criminal syndical-ism, sub-section 4 makes it a crime for a person to associate in an organization with others who *propose* to preach it.

See Whitney v. People of State of California, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095, 1104–1105 (1927), concurring opinion of Mr. Justice Brandeis.

Sub-section 4 violates yet another constitutional principle. It does not require, as a condition precedent to prosecution, that the member of the suspect organization is, himself, devoted to the unlawful aims of the organization and desirous of fulfilling them. It would permit prosecution on the basis of membership alone.

"[U]nder our traditions beliefs are personal and not a matter of mere association, and * * * men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." Schneiderman v. United States, 320 U.S. 118, 136, 63 S.Ct. 1333, 1342, 87 L.Ed. 1796, 1808 (1943).

Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), was concerned with a statute that barred employment of members of listed organizations. The statute, whose terms were substantially identical to sub-section 4 of the Act here concerned, was declared invalid on its face. The opinion contained the following, which is closely applicable here:

"Mere knowing membership without a specific intent to further the unlawful aims of an organization is not a constitutionally adequate basis for exclusion from such positions as those held by appellants." (385 U.S. at 606, 87 S.Ct. at 685).

A statute similar to that involved in *Keyishian* was invalidated in Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966). In writing for the Court, Mr. Justice Douglas said: "A law which applies to membership without the 'specific intent' to further the illegal aims of the organization infringes unnecessarily on protected freedoms. It rests on the doctrine of 'guilt by association' which has no place here." (384 U.S. at 19, 86 S.Ct. at 1242).

The Subversive Activities Control Act of 1950, 50 U.S.C. § 784(a) (1) (D), provides that no member of a Communist-action organization may lawfully "engage in any employment in any defense facility." The Supreme Court, in the very recent case of United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), held the statute unconstitutional on its face, as a violation of the First Amendment, because it did not limit its application to those members who had specific intent to further the unlawful goals of the organization concerned.

In Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), the Court held overbroad, and thus unconstitutional on its face, a statute that deprived members of Communist organizations of the right to travel abroad, irrespective of any showing that they were devoted to the organizations' unlawful objectives.

If mere knowing membership in an organization may not form the basis for loss of employment or for restrictions upon foreign travel, it necessarily follows that such membership may not constitutionally constitute a felony.

*Sub-section 5* makes subject to criminal prosecution any person who "Wilfully * * * practices or commits any act * * * taught or aided and abetted by the doctrine * * * of criminal syndicalism, with intent to accomplish * * * any political change." This is the most vague, uncertain and overbroad provision of all. Criminal syndicalism is defined, in section 11400 of the Act, as a doctrine " * * * advocating, teaching or aiding and abetting * * * " unlawful acts of force looking toward violent overthrow. Do acts taught by the doctrine, and thus condemned by sub-section 5, include the acts of teaching and advocating and abetting violent overthrow? If so, such acts are already condemned by sub-section 1, and the prohibition of such acts violates the First and Fourteenth Amendments for the reasons previously discussed in this opinion.

Assuming that the "acts" envisaged by sub-section 5 go beyond teaching and doctrinal advocacy, what conduct would be included? Would casting a vote for a Communist in a political election be conduct " * * * taught or aided and abetted by the doctrine * * * "? Would a person who rents a hall to an organization dedicated to criminal syndicalism, or who prints a placard for use in one of its parades, risk prosecution under the Act? Beyond doubt, some of the activities that sub-section 5 seeks to reach involve conduct amounting to force or violence or incitement that properly may be punished, and which conceivably may not be covered by other criminal statutes. However, "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." Lanzetta v. State of New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888, 890 (1939). Sub-section 5 completely fails in this respect, and it is not a court's function to cut down the scope of an overbroad law operating in the field of the First Amendment and refine it to constitutional proportions. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

In light of all of the foregoing, we are convinced that we are no longer bound by Whitney v. People of State of California,[2] 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), and that application of present and more enlightened concepts of the meaning of the First Amendment requires the holding that the Act is unconstitutional on its face. We so declare. Cf. Ware v. Nichols, 266 F. Supp. 564 (N.D.Miss.1967).

In arriving at this decision, we wish to emphasize that we are fully sympathetic with the right and obligation of a state to protect itself, but we are authoritatively and properly reminded that " * * * even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960). A similar and equally pertinent expression is found in the opinion by Mr. Chief Justice Warren, speaking for the Court in United States v. Robel, 389 U.S. 258, 267–268, 88 S.Ct. 419, 425–426, 19 L.Ed. 2d 508, 516–517 (1967):

> "Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a 'less drastic' impact on the continued vitality of First Amendment freedoms. [Citing cases.] The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less."

We should like also to make clear that our decision in no way stems from any apprehension of our own that plaintiffs Dan, Hirsch or Broslawsky stand in any danger of prosecution by the respondent, the present District Attorney of Los Angeles County, because of the activities that they ascribed to themselves in the complaint, as mentioned at the outset of this opinion. Nor do we imply the existence of a likelihood that the courts of California would entertain such prosecutions if instituted. However, "Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a

---

2. Cf. Barnette v. West Virginia State Board of Education, 47 F.Supp. 251 (S. D.W.Va.1942), in which a three judge court declared unconstitutional a compulsory flag salute law even though the same type of statute had been upheld by the Supreme Court two years before in Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940). The decision was affirmed on appeal a year later in an opinion that specifically overruled *Gobitis*. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943).

vague law." Baggett v. Bullitt, 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed. 2d 377, 386 (1964).

The defendant's motion to dismiss the complaint is denied.

We believe that our declaration that the Act is unconstitutional on its face is all of the relief that is necessary to be accorded the plaintiffs at this time, inasmuch as we are confident that while this decision stands the defendant would adhere to it and would refrain from further prosecutions under the Act. However, we have some concern that for us to withhold injunctive relief may deprive the defendant of the right to appeal to the Supreme Court otherwise accorded him by 28 U.S.C. § 1253. Accordingly, by separate order, a temporary injunction will be issued by this court which will enjoin the defendant from further prosecution of the currently pending action against plaintiff Harris for alleged violation of the Act.

JERTBERG, Circuit Judge, and FERGUSON, District Judge, concur.