George SAMUELS, Abraham C. Taylor, Herman Benjamin Ferguson, Arthur Harris, Mandola McPherson, Max Stanford, Merle Stewart, Hampton Woodward Rockward, Ursula Virginia West and Milton Ellis, Plaintiffs,

v.

Thomas J. MACKELL, District Attorney of Queens County, and Louis J. Lefkowitz, Attorney General of the State of New York, Defendants.

Fred FERNANDEZ, Plaintiff,

v.

Thomas J. MACKELL, District Attorney of Queens County, and Louis J. Lefkowitz, Attorney General of the State of New York, Defendants.

Nos. 68 Civ. 1030, 68 Civ. 1196.

United States District Court
S. D. New York.

June 26, 1968.

Probable Jurisdiction Noted
Dec. 9, 1968.

See 89 S.Ct. 453.

Victor Rabinowitz, New York City, (Rabinowitz, Boudin & Standard, New York City), for plaintiffs George Samuels, Abraham C. Taylor, Herman Benja-

min Ferguson, Arthur Harris, Mandola McPherson, Max Stanford, Merle Stewart, Hampton Woodward Rockward, Ursula Virginia West and Milton Ellis.

Isidore Beerman, New York City, for plaintiff Ursula West.

Eleanor Jackson Piel, New York City, for plaintiff Fred Fernandez.

Peter J. O'Connor, New York City, (Mortimer Sattler, Asst. Atty. Gen. of New York State, New York City, Patrick J. Broderick on brief), for defendants Thomas J. Mackell and Louis J. Lefkowitz.

Before FRIENDLY, Circuit Judge, and BRYAN and WYATT, District Judges.

FRIENDLY, Circuit Judge:

Plaintiffs in these consolidated actions[1] are the subjects of a superseding indictment filed by a grand jury in the Supreme Court for Queens County, New York. The indictment contains 48 counts, many of these being against only one or some of the plaintiffs. Forty-one counts charge violations of former New York Penal Law, McKinney's Consol. Laws, c. 405 § 1897[2] relating to the possession of weapons. Another count alleges conspiracy to commit arson in the third degree, Penal Law § 223. What concerns us are counts charging criminal anarchy.

The first count alleges advocacy of criminal anarchy in violation of §§ 160 and 161, subd. 1, see fn. 4, in that defendants advocated orally and in writing the overthrow of the governments of the State and its political subdivisions "by force and violence, to wit, the use of rifles, shotguns, firearms, bombs and ignited gasoline against publicly owned and operated transportation facilities, and against executive officials of said State and its various political subdivisions and agencies, including peace officers thereof, and by assassination of

said executive officials, and by other unlawful means and with the further intent that said acts be presently attempted and accomplished." The second count asserts that, in violation of §§ 160 and 161, subd. 2, defendants published and circulated certain printed matter urging the violent overthrow of the State and its political subdivisions and agencies "by force and violence, to wit, by sabotage of public transportation and communication facilities, assassination of police officers of said State and its various political subdivisions and agencies, and members of the State Guard of said State, and by other unlawful means, and with the further intent that said acts be presently attempted and accomplished." The third count charges that, in violation of §§ 160 and 161, subd. 4, defendants organized and helped to organize and became members of and voluntarily assembled with each other in a society formed to teach and advocate the doctrine that the governments of New York and its various political subdivisions and agencies be overthrown by force and violence as described in the first count. The fourth count alleges a conspiracy to commit the crime alleged in the first three, Penal Law § 580. Two other counts charge that Samuels and Stewart permitted premises to be used for the assemblage of persons assembled for the purpose of advocating and teaching that the governments of the State and its various political subdivisions and agencies should be overthrown by force and violence.

The complaints, based in part upon the Civil Rights Act, 42 U.S.C. § 1983, seek an injunction against prosecution under the indictment or, alternatively, a declaratory judgment of invalidity, on the grounds that the New York criminal anarchy statute, Penal Law §§ 160, 161 and 163, violated the First Amendment of the Constitution of the United States, made applicable to New York by the Fourteenth, and entered an area exclu-

---

**1.** The Fernandez action was brought in the Eastern District of New York and transferred here by consent.

**2.** All references are to the former Penal Law, repealed September 1, 1967, unless otherwise stated.

sively occupied by the Federal Government, see Com. of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L. Ed. 640 (1956). They also attack § 596, subd. 3 of New York's Judiciary Law, McKinney's Consol.Laws, c. 30, requiring that a juror "be the owner, in his or her own right, of real or personal property of the value of two hundred and fifty dollars; or the husband of a woman or wife of a man who is the owner, in his or her own right, of real or personal property of that value" as violating requirements of the Federal Constitution that a person may be indicted only by a grand jury representing a fair cross-section of the community,[3] and § 596, subd. 6, now § 596, subd. 5, of the Judiciary Law in that it furnished no definable standards as to how grand jurors were to be selected. The defendants answered, seeking dismissal of the complaints. Finding that the complaints raised substantial questions under the Constitution, Judge Bryan requested the convocation of a court of three judges, 28 U.S.C. §§ 2281 and 2284. We now have before us motions by the plaintiffs both for a preliminary injunction against continuation of the prosecution and for summary judgment.

The New York criminal anarchy statute is an old one, going back to 1902. Its enactment was a response to the assassination of President McKinley in Buffalo the preceding year, see People v. Gitlow, 234 N.Y. 132, 156, 136 N.E. 317 (1922) (dissenting opinion of Judge Pound). The language was very broad. Section 160 defined criminal anarchy:

> Criminal anarchy is the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means.

and made "the advocacy of such doctrine either by word of mouth or writing" a felony, without, however, prescribing a penalty. Section 161[4] spelled out various types of acts within this general concept which constitute felonies punishable by imprisonment for not more than 10 years, fine of not more than $5000, or both. Section 162 forbade assemblages of two or more persons for advocating or teaching criminal anarchy, and § 163 forbade permitting such an assemblage —this being a misdemeanor punishable by imprisonment for not more than 2 years, fine of not more than $2000, or both. Under the new Penal Law, effective September 1, 1967, the various

---

3. Since subdivision 3 was repealed, effective September 1, 1967, plaintiffs' attack is necessarily limited to the State grand jury. Although the superseding indictment was filed thereafter, counsel advised us that this was returned by the same grand jury that had rendered the original indictment.

4. § 161. Advocacy of criminal anarchy
   Any person who:
   1. By word of mouth or writing advocates, advises or teaches the duty, necessity or propriety of overthrowing or overturning organized government by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means; or
   2. Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any form, containing or advo-

cating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means; or
   3. Openly, wilfully and deliberately justifies by word of mouth or writing the assassination or unlawful killing or assaulting of any executive or other officer of the United States or of any state or of any civilized nation having an organized government because of his official character, or any other crime, with intent to teach, spread or advocate the propriety of the doctrine of criminal anarchy; or
   4. Organizes or helps to organize or becomes a member of or voluntarily assembles with any society, group or assembly of persons formed to teach or advocate such doctrine.
   Is guilty of a felony and punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both.

criminal anarchy sections are combined in a single provision reading as follows:

§ 240.15 Criminal anarchy

A person is guilty of criminal anarchy when (a) he advocates the overthrow of the existing form of government of this state by violence, or (b) with knowledge of its contents, he publishes, sells or distributes any document which advocates such violent overthrow, or (c) with knowledge of its purpose, he becomes a member of any organization which advocates such violent overthrow.

Plaintiffs mount a double-barreled attack on the old statute. They say that although its constitutionality was sustained in Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), over a dissent by Justices Holmes and Brandeis, later decisions of the Supreme Court, notably Dennis v. United States, 341 U.S. 494, 507–511, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), and Yates v. United States, 354 U.S. 298, 318–319, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), render it plain that *Gitlow* has been overruled and that a statute making the teaching or advocacy of anarchy a crime can be constitutional only if limited to those words or acts aimed at the violent overthrow of government which, as said in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919), create "a clear and present danger that they will bring about the substantive evils" the legislature "has a right to prevent"—as, indeed, the New York Court of Appeals has recently recognized. People v. Epton, 19 N.Y.2d 496, 281 N.Y.S.2d 9, 227 N.E.2d 829 (1967), cert. denied and appeal dismissed for want of a substantial federal question, 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 824 (1968). They add that the unconstitutionality of §§ 160–163 would not be removed even if—as they dispute—the instant indictment required proof of facts within the *Schenck-Dennis* formulation, since the overbreadth of the statute would have a "chilling effect" on persons desiring to engage in teaching or advocacy in the area between the central core that might be constitutionally forbidden and the broader circumference to which the statute extends. For this they find support in such decisions of the Supreme Court as Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and in decisions of three judge courts invalidating the Mississippi, Kentucky and California Criminal Syndicalism Acts. Ware v. Nichols, 266 F.Supp. 564 (D.Miss.1967); Baker v. Bindner, 274 F.Supp. 658 (W.D.Ky.1967); Harris v. Younger, 281 F.Supp. 507 (C.D.Cal. 1968). They contend in addition that the language of the former New York statute was broad enough to include teaching or advocating the overthrow of the Federal Government, a field held in Pennsylvania v. Nelson, supra, to have been preempted against the states by the Smith Act, 18 U.S.C. § 2385; indeed they point to a passage in one of the two majority opinions of the Court of Appeals in *Gitlow* which construed New York's criminal anarchy statute as extending that far, 234 N.Y. at 138, 136 N.E. 317 (opinion of Judge Crane). Against the point that the superseding indictment charged only attempting to overthrow state and local governments, they again argue overbreadth.

■ The State responds that, however all this might have been if the case had come to us some years back, plaintiffs' arguments are drained of their force by the decision of the Court of Appeals in *Epton*. Taking note of constitutional development in the forty-five years since its decision in People v. Gitlow, supra, that court, with Judge Burke dissenting, reinterpreted the criminal anarchy statute "in accordance with sound constitutional principles so as to preserve its constitutionality." 19 N.Y.2d at 505, 281 N.Y.S.2d at 16, 227 N.E.2d at 834. It held that the statute must be read as requiring not merely advocacy or teaching of violent overthrow of the government by force and violence but an intent to accomplish the overthrow and a "clear and present dan-

ger" that the advocated overthrow may be attempted or accomplished. 19 N.Y. 2d at 506, 281 N.Y.S.2d at 17, 227 N. E.2d 829.[5] It held also, as we read the opinion, 19 N.Y.2d at 507, 281 N.Y.S.2d at 17–18, 227 N.E.2d 829, that, as the new Penal Code makes plain, the old statute also must be confined to attempted overthrow of the government of New York or a local subdivision, thereby saving it from successful attack on preemption grounds, Uphaus v. Wyman, 360 U.S. 72, 76–77, 79 S.Ct. 1040, 3 L. Ed.2d 1090 (1959); DeGregory v. Att'y General of New Hampshire, 383 U.S. 825, 829–830, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966).

Far from welcoming this restriction of the area of permissible prosecution under the criminal anarchy statute, the plaintiffs protest it. They contend that the Court of Appeals had no power in 1967 to give the statute a narrower reading than the same court had found in 1922 to be the intent of the legislature of 1902. We do not understand why; it seems quite reasonable for the court to have ruled that if the 1902 legislature had known it could not have all it wanted, it would have wanted all it could have. Time and again the Supreme Court has narrowed the language of Congressional acts to save their constitutionality, see. e.g., Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), and, most notably in the present context, in the case of the Smith Act whose language is nearly identical with the New York statute, see Dennis v. United States, supra, 341 U.S. at 502–511, 71 S.Ct. 857, 95 L.Ed. 1137. We are unable to discern why an earlier broader reading should bar that course. In any event if the Court of Appeals transcended the powers vested in it by the people of New York by narrowing its previous construction of the criminal anarchy statute, which we in no way intimate, this would be entirely a matter of state law and not one of federal concern.

Plaintiffs argue further, relying particularly on Dombrowski v. Pfister, supra, that, even if *Epton* would be a sufficient answer as to future criminal activity, the New York statute had not been thus narrowed to constitutionally permissible limits when most of the acts charged in the indictment were committed. The State counters that *Dombrowski* dealt with a situation where the statute could be brought within acceptable limits only "through a series of criminal prosecutions, dealing as they

---

5. We reject plaintiffs' claims that, even after *Epton,* the statutes under which they have been indicted are still unconstitutionally vague in scope. Four of their arguments merit discussion. First, while *Epton* does not expressly state that only when the speaker uses language that *incites to action* may he be prosecuted under §§ 160 and 161, see Yates v. United States, id. at 320–325, in the *Gitlow* case itself, both the Court of Appeals, 234 N.Y. at 149, 136 N.E. 317, and the Supreme Court, 268 U.S. at 664–665, so construed the statute. Though the indictment in the present case does not expressly charge indictment—indeed its charge that the defendants advocated the "duty" and "necessity" of overthrow was expressly held inadequate in *Yates,* 354 U.S. id. at 324, 77 S.Ct. 1064,—it is the indictment, not the statute, that is overly broad in this respect. Second, while the Court of Appeals did not expressly deal with those clauses in §§ 160· and 161 that prohibit the advocacy of overthrow "by any unlawful means" other than force and violence, the fair implication is that these provisions have been read out of the statute. Third, we think it apparent that the same principle of construction applied in *Epton* would limit the relevant portion of § 161, subd. 4 to becoming a member with knowledge that the society advocates the overthrow of government by force and violence and intends that this be accomplished. Contrast United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). Finally, while the *Epton* court had no occasion to construe old § 163 which forbade any owner, agent or occupant "willingly and knowingly" to permit two or more anarchists the use of premises under his control it follows under the principles of the *Epton* decision that to violate § 163 one must know of the present danger of violence.

inevitably must with only a narrow portion of the prohibition at any one time, and not contributing materially to articulation of the statutory standard," 380 U.S. at 491, 85 S.Ct. at 1123, 14 L.Ed. 2d 629. The Court, it says, there made clear it was speaking only of a case where "the conduct charged in the indictments is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution," whereas here the Court of Appeals' adoption of the Supreme Court's reading of similar statutory language in *Dennis* was precisely such a construction and the acts are "the sort of 'hard-core' conduct that would obviously be prohibited under any construction." 380 U.S. at 491–492, 85 S. Ct. at 1124. The State caps its argument by citing a footnote in *Dombrowski* where the Court added, 380 U.S. at 491 n. 7, 85 S.Ct. at 1123:

> Our cases indicate that once an acceptable limiting construction is obtained, it may be applied to conduct prior to the construction, see Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105; Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049; Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, provided such application affords fair warning to the defendants, see Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; cf. Harrison v. NAACP, 360 U.S. 167, 179, 79 S.Ct. 1025, 1031, 3 L.Ed.2d 1152.

Plaintiffs contend that as to them the proviso as to "fair warning" was not met. In one sense it clearly was. Since the statute embraced more than it permissibly could embrace, it surely embraced the "hard-core" activities with which they are charged. Cf. Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Although an unduly broad statute is objectionable on other grounds, lack of fair warning is not one; the case differs essentially from the unduly vague statute like that in Lanzetta v. New Jersey [belonging to a "gang"], which the Court's footnote cited as an example. Plaintiffs' point is a rather different one. Until *Epton*, they say, they had every reason to believe the New York criminal anarchy statute as construed by the Court of Appeals in *Gitlow* was unconstitutional. The *Dennis* opinion indicated this, no attempt at enforcement or amendment had been made thereafter, and they could not reasonably have anticipated that the Court of Appeals by overruling its earlier decision would restore life to an act that was moribund. Although under *Dombrowski* persons engaging in "hard-core" activities take their chances on "an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution," it is unreasonable, they say, to apply this rule when the statute has once been broadly construed by the highest court of the state even though—or perhaps particularly because —that construction would render the statute void under current constitutional doctrine.

■ The argument strikes us as somewhat artificial.[6] The case is not like James v. United States, 366 U.S. 213, 221–222, 81 S.Ct. 1052, 6 L.Ed.2d 246, 241, 242–247 (1961), where defendants were charged with wilfully failing to report income resulting from embezzlement which an earlier decision, never expressly overruled, had held they were not required to report. No court of New York had ever told the defendants they could engage in the type of activity charged in the indictment with impunity. The alleged non-enforcement of the New York criminal anarchy statute did not have the effect that might reasonably have been attributed to Connecticut's "undeviating policy" of non-enforcement

6. While *Epton* necessarily decided this issue adversely to the plaintiffs' argument, we cannot be certain whether the Supreme Court in dismissing the appeal, 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 824, passed on that point or rested decision on the concurrent sentences on other counts.

of its anti-contraceptive statute in the face of flagrant violation, which could well have led citizens to believe they could flout the statute without risk of prosecution. See Poe v. Ullman, 367 U. S. 497, 502, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Neither the complaints nor the moving affidavits allege that plaintiffs entertained the beliefs their lawyers now ingeniously impute to them and, for reasons indicated, we do not understand why the *Epton* decision was not expectable. In any event this point, which would require an examination of defendants' state of mind, is the sort of issue that becomes ripe for constitutional adjudication only upon a fully developed record, see Eccles v. People's Bank, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948) (Frankfurter, J.); Wright, Federal Courts 391–92 (1963), cf. Bickel, The Least Dangerous Branch, ch. 4 (1962); United Public Workers v. Mitchell, 330 U.S. 75, 89–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and would afford no basis for declaratory or, *a fortiori*, injunctive [7] relief.

Even if we should be wrong on this last point or as to plaintiffs' other arguments that *Epton* could not validate application of the old statute to them, see footnote 5, we would still consider the grant of such relief inappropriate under the special circumstances here presented. In saying this we are fully aware of the directives recently given by the Supreme Court, not only in Dombrowski v. Pfister, supra, but also

in such cases as McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L. Ed.2d 444 (1967), see also Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). However, the common thread running through all these cases—the need of federal declaratory or injunctive relief to protect plaintiffs' constitutional rights with respect to future conduct or events—is wholly absent here. The presently effective New York criminal anarchy statute, Penal Law § 240.15,[8] read in light of *Epton*, does not unconstitutionally restrict the First Amendment rights of these plaintiffs or of anyone else. We do not think that the Court in *Zwickler* had any intention to overrule the basic principles governing the propriety of declaratory or injunctive relief and to require a federal court to render a declaratory judgment whenever a present or prospective defendant shows that application of a state criminal statute to him would violate a constitutional right, even though there is no possibility that presenting the defense in a pending prosecution and seeking review in the Supreme Court if it is there rejected would "effect the impermissible chilling of the very constitutional right he seeks to protect." 389 U.S. at 252, 88 S.Ct. at 397. Such a view would run directly counter to the discussion in *Dombrowski*, 380 U.S. at 483–485, 85 S.Ct. 1116, 14 L.Ed.2d 22. See also Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 243–244

---

7. The question whether the provision in the Civil Rights Act, now 42 U.S.C. § 1983, authorizing a "suit in equity," brings that statute within the exception of the anti-injunction statute, 28 U.S.C. § 2283, "except as expressly authorized by Act of Congress," is one of great consequence on which inferior federal judges have sharply differed and the Supreme Court has not found occasion to rule. See Dombrowski v. Pfister, supra, 380 U.S. at 484 n. 2, 85 S.Ct. 1116, 14 L.Ed. 2d 22; Cameron v. Johnson, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (1965) and 390 U.S. 611 n. 3, 88 S.Ct. 1335, 20 L.Ed.2d 182 (majority opinion) and n. 5 (dissenting opinion) (1968). Cf.

City of Greenwood v. Peacock, 384 U.S. 808, 829, 852–853, 86 S.Ct. 1800, 16 L. Ed.2d 944 (1966). The American Law Institute has proposed a much more limited exception, Study of the Division of Jurisdiction between State and Federal Courts, § 1372(7), Tent. Draft No. 6 (1968).

8. The new statute, among other things, eliminates the "any unlawful means" language of § 161, subds. 1 and 2 and the assemblage clause, § 163, and makes clear that membership is punishable only if accompanied by knowledge of the organization's purpose to advocate violent overthrow—in the *Epton* sense.

**356**

(1952); Borchard, Declaratory Judgments 1022 (2d ed. 1941). *Zwickler* was a classic case for declaratory relief; the plaintiff needed to know promptly whether he could distribute anonymous handbills free of New York's threat of punishment. But, with New York law changed as it has been, the instant plaintiffs will not suffer any impairment of First Amendment rights to denounce the government of the state or its subdivisions if they must wait for a federal answer as regards conduct long since past until the state has determined what acts, alleged to be punishable under the statute and the Constitution, they have in fact committed. While their prospect of success in the New York courts may not be bright in view of *Epton,* in this instance Supreme Court review affords wholly adequate relief. See also Zwicker v. Boll, 391 U. S. 353, 88 S.Ct. 1666, 20 L.Ed.2d 642 (May 20, 1968).

We are not persuaded to a different view by plaintiffs' apprehension that if they should be found guilty on other counts of the indictment, New York might seek to frustrate an appeal to the Supreme Court, as they contend it did in *Epton,* by making their sentences on the criminal anarchy counts concurrent with those on other counts. Not only is this entirely speculative but even if New York should do what plaintiffs fear and the Supreme Court should dismiss their appeal as it did in *Epton,* the Court would do that only because it felt there was no cause for federal concern. New York would have punished the plaintiffs for crimes—illegally possessing weapons and conspiring to commit arson—within its power, and, in light of the new statute and *Epton,* its doing so would have no "chilling effect" on persons desiring now or in the future to teach or advocate the overthrow of government within constitutional bounds. Plaintiffs' fear that New York will use an overbroad criminal anarchy statute in bad faith as a weapon for restraining constitutionally protected speech, while avoiding Supreme Court review, ignores that New

York cannot do this so long as *Epton* stands. In contrast to Keyishan v. Board of Regents, supra, we do have the benefit of a "judicial gloss," 385 U.S. at 601, 87 S.Ct. at 682,—and of a greatly simplified statute as well.

■ There remain the plaintiffs' two challenges, going to the entire indictment, which concern New York's method of selecting grand jurors. We have little doubt that, despite the decision of this court in United States v. Foster, 83 F.Supp. 197 (S.D.N.Y.1949), cf. Ex parte Fahey, 332 U.S. 258, 259, 291–294, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947), application of even a modest property qualification for grand jurors might now be held unconstitutional, cf. Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); Labat v. Bennet, 365 F.2d 698, 723 (5 Cir. 1966), cf. Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S. Ct. 1079, 16 L.Ed.2d 169 (1966), and New York has acted wisely in abolishing it, see fn. 3. However, the defendants have submitted an affidavit by the County Clerk of Queens County that the property requirement had no significance in his selection of jurors since he has long proceeded on the theory, whether factually correct or not, that everyone possessed the minimal amount of property specified. We find far less force in plaintiffs' attack on former subdivision 6, now 5, of § 596 of the Judiciary Law providing that to serve as a grand juror, a person must "* * * be intelligent; of sound mind and good character; well informed * * *," in the absence of evidence of abuse, see Swain v. State of Alabama, 380 U.S. 202, 205–206, 209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Chestnut v. New York, 370 F.2d 1, 7 at n. 13 (2 Cir. 1966), cert. denied 386 U.S. 1009 (1967). Rabinowitz v. United States, 366 F.2d 34 (5 Cir. 1966), on which plaintiffs rely, did not hold such standards to be unconstitutional; the decision went rather on the ground that the clerk and the jury commissioner had superimposed additional standards of their own, designed in part to diminish

the number of negro jurors, on the uniform standards enacted by Congress in 1957, 28 U.S.C. § 1861. However all this may be, we see no reason why plaintiffs' contentions as to grand jury selection cannot be effectively presented in the New York courts and to the Supreme Court on review. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138 (1951). Indeed, these questions, going to the validity of this and many other indictments, seem peculiarly a matter to be determined by the state courts in the first instance. Chestnut v. People of State of New York, supra, 370 F.2d at 6–8; U. S. ex rel. Epton v. Nenna, 281 F.Supp. 388, 390 (S.D.N.Y. 1968).

Since the complaints present no case for federal relief, the Clerk is directed to enter a judgment of dismissal, as prayed by the State.