J. L. LeFLORE et al., Plaintiffs-Appellants,

v.

James ROBINSON et al., Defendants-Appellees.

No. 28632.

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1970.

Jack Greenberg, Jonathan Shapiro, New York City, Charles L. Becton, Charlotte, N. C., Vernon Z. Crawford, Mobile, Ala., for plaintiffs-appellants.

Fred G. Collins, William H. Brigham, Francis A. Poggi, Jr., Asst. City. Atty., T. Raymond Williams, Allan R. Cameron, Mobile, Ala., for defendants-appellees.

Before GEWIN, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

As Mobile, Alabama, prepared to crown America's Junior Miss of 1969, the black community intensified its quest for racial equality by engaging in a series of protest demonstrations. One consequence of the resulting turmoil and confusion is a congeries of legal problems relating to ordinances of the City of Mobile and their effect on First Amendment rights. Plaintiffs, who are being prosecuted or threatened with prosecution by Mobile for violations of these ordinances, appeal from the decision of the district court dismissing their plea for federal intervention. Bearing in mind that First Amendment rights are not of paper weight but are made of sterner stuff, we reverse and remand in part.

## I.

Omitting historically interesting preludes and sketching only those facts which appear undisputed, we begin with N.O.W.,[1] whose avowed purpose was to secure "equal rights for black people in Mobile." During the Spring of 1969, this

---

1. Neighborhood Organized Workers.

organization directed its attention to the policies of the Mobile Municipal Auditorium, soon to be the scene of the nationally televised America's Junior Miss Pageant. Picketing and protesting preceded the pageant, but there were no arrests. On May 1, 1969, the first night of the pageant, this relative tranquility terminated with the arrest of nearly 90 people by the Mobile police for parading without a permit in violation of Mobile, Alabama, Code § 14–051, and obstructing free passage of streets or other public places in violation of Mobile, Alabama, Code § 14–7. Things worsened on May 2nd and 3rd when approximately 250 more people were arrested and charged with unlawful assembly under Mobile, Alabama, Code § 14–11.

On May 5, 1969, plaintiffs filed this action seeking declaratory and injunctive relief on behalf of themselves and other members of their class "who have been subjected to, are presently being subjected to, and who will be subjected to" the application of certain Mobile ordinances. Specifically, plaintiffs sought (1) a declaration that the above ordinances under which charges were pending, and Mobile, Alabama, Code § 14–11, under which charges were threatened, were unconstitutional on their face and as applied; (2) an injunction enjoining all pending prosecutions of plaintiffs and members of their class; and (3) a protective injunction enjoining defendant Mobile officials from interfering in the future with plaintiffs' peaceful protest activity. Plaintiffs argued not only that the Mobile ordinances were unconstitutionally overbroad and vague, but that their protest activity was privileged under the First Amendment and was being abridged in bad faith by the Mobile officials. Conversely, defendants argued that plaintiffs' protest activities were not protected expression but instead represented a threat to the city's legitimate interest in maintaining the safety and order of its streets and public places. The city officials contended that the pending charges were brought in good

faith under ordinances which were constitutionally valid.

The federal district court for the Southern District of Alabama denied plaintiffs' motion for a temporary restraining order and, after a hearing on plaintiffs' motion for a preliminary injunction by affidavit only, dismissed both the motion and the complaint. The court, over plaintiffs' objection, found that there were no disputed factual issues. It then ruled that the ordinances were constitutional both facially and as applied, and that the arrests were made and the prosecutions were being conducted in good faith. While agreeing that one ordinance is indeed facially valid, we disagree with the determination below that all pass constitutional muster. Moreover, we find error in the refusal of the district court to conduct an evidentiary hearing on plaintiffs' other contentions, and we remand in part so that plaintiffs may have their day in court on the issues which we do not here resolve.

II.

The plaintiffs' initial complaint is that the four Mobile ordinances in question are on their face unconstitutionally vague and overboard. An examination of the policies underlying facial review leads us to the conclusion that the issues presented by this allegation must be resolved prior to remand.

■■ The argument that the Mobile ordinances are void for vagueness is an argument that the ordinances either forbid or require "the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. The argument that the ordinances are overbroad, on the other hand, is an argument that the ordinances "although lacking neither clarity nor precision," violate the constitutional principle that "a governmental purpose to control or prevent activities constitutionally subject

to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, 1967, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, 451, quoting NAACP v. Alabama, 1964, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325, 338.

Despite these conceptual distinctions, the two-fold challenge lodged at the Mobile ordinances by plaintiffs rests on an identical principle, the chilling effect which such laws have on constitutionally protected activity.[2] Facial overbreadth scrutiny emphasizes the need to eliminate an overbroad law's deterrent impact on protected expressive activity. Dombrowski v. Pfister, 1965, 390 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. "Chilling effect" is a short-hand way of describing this vice of an overbroad law. Since by definition an overbroad statute covers some privileged as well as non-privileged activity, the statutory burden operates as a disincentive to action and creates an *in terrorem* effect on conduct within the protection of the First Amendment. Rather than await case-by-case excision of the statute's overbreadth through review of its application to particular conduct, courts invalidate the statute facially so as to end its deterrence of constitutionally protected activity when they conclude that as applied review will be needlessly time-consuming and ineffective. In the First Amendment area, the vagueness doctrine reflects this same concern. Lack of fair warning to actors or lack of adequate standards to guide enforcers also may lead to a "chill" on privileged activity. A person contemplating action who might be covered by a vague statute is left in doubt as to whether he will be prosecuted and, if so, whether his claim of privilege will be upheld.

The functional indistinguishability of the two doctrines is often recognized:

"The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchannelled delegation of legislative powers but upon the danger of tolerating, in the area of the First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." NAACP v. Button, 1963, 371 U.S. 415, 432–433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418 (Brennan, J.).

See generally Note, The First Amendment Overbreadth Doctrine, *supra*, at 871–75.

In the present case it is clear that a mere remand to the district court for an evidentiary hearing to determine whether the ordinances, as applied to plaintiffs and to members of their class, are unconstitutional is simply not responsive to the policies underlying the overbreadth and vagueness doctrines. While plaintiffs, if it be determined that their conduct was privileged, might escape the statutory burden, the ordinances, if overbroad, would remain as a disincentive to those who are less hardy. We must therefore decide at first instance the facial validity of the questioned ordinances to avoid the chilling effect which these laws if invalid might have on First Amendment rights.

■■ Similarly, we find it irrelevant that an adequate appellate record might demonstrate that the conduct of plaintiffs was not protected under the First Amendment. The Supreme Court has taught us that where an overbreadth or vagueness challenge is raised, traditional laws of standing must be modified to allow a person burdened by an overbroad or vague law to assert its facial invalidity even though his own conduct may

2. For discussions of the theoretical principles underlying the overbreadth and vagueness doctrines, see Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970); Note, The Void-For Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960).

not be privileged.[3] To do otherwise would constitute continued tolerance of a *chill on the expressive activity of others.* As the Court stated in *Dombrowski, supra,* 380 U.S. at 486, 85 S.Ct. at 1121:

> "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser. Cf. Garrison v. [State of] Louisiana, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215, 216, 13 L.Ed.2d 125, 132, 133. For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. Thornhill v. [State of] Alabama, 310 U.S. 88, 97–98, 60

S.Ct. 736, 741–742, 84 L.Ed. 1093, 1099, 1100; NAACP v. Button, supra, 371 U.S., at 432–433, 83 S.Ct., at 337–338, 9 L.Ed.2d at 417, 418; cf. Aptheker v. Secretary of State, 378 U.S. 500, 515–517, 84 S.Ct. 1659, 1668–1669, 12 L.Ed. 2d 992, 1002, 1003; United States v. Raines, 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524, 529. We have fashioned this exception to the usual rules governing standing, see United States v. Raines, supra, because of the ' * * * danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.' NAACP v. Button, supra, 371 U.S., at 433, 83 S.Ct., at 338, 9 L.Ed.2d at 418. If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation. Cf. Ex parte Young, supra, 209 U.S. [123] at 147–148, 28

---

3. It is true that some courts have cautioned that an overbreadth challenge cannot be made by a claimant whose conduct is the sort of "hard core" conduct that would be punishable under any legitimate construction of the challenged law. See Dombrowski v. Pfister, supra, 380 U.S. at 491–492, 85 S.Ct. 1116. This qualification has usually been expressed in dicta, but cf. Wright v. City of Montgomery, 5 Cir. 1969, 406 F.2d 867, 871 & n. 7, and has not been universally followed. See, e. g., Aptheker v. Secretary of State, 1964, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992; Kunz v. New York, 1951, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280; Thornhill v. Alabama, 1940, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093, 1100 ("An accused * * * does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities"). If a law is truly overbroad or vague, we fail to see how refusal to examine facial constitutionality even if the claimant's conduct is denominated "hard core" is responsive to the policies of those doctrines as articulated by the Supreme Court. In any event, we do not consider it necessary to remand for an evidentiary hearing into whether plaintiffs' conduct

can be so classified. In *Dombrowski* itself the Court examined for overbreadth without the benefit of an evidentiary record—the "hard core" language was with reference to the conduct charged in the indictments:

> "On this view of the "vagueness" doctrine, it is readily apparent that abstention served no legitimate purpose where a statute regulating speech is properly attacked on its face, and where, as here, *the conduct charged in the indictments* is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not the sort of 'hardcore' conduct that would obviously be prohibited under any construction." Dombrowski v. Pfister, supra, 380 U.S. at 491–492, 85 S.Ct. at 1123–1124 (emphasis added).

See also Carmichael v. Allen, N.D.Ga. 1967, 267 F.Supp. 985, 996.

We think it is clear that the conduct charged in the Mobile prosecutions and at issue in this case cannot be deemed "hard core" under any reasonable construction of that phrase. Therefore, plaintiffs, despite the absence of an adequate appellate record, have *standing to* raise the overbreadth and vagueness issues.

S.Ct. [441] at 448–449, 52 L.Ed. [714] at 723, 724."

■ Many of these same considerations also lead us to decline defendants' invitation to abstain in favor of the pending municipal court prosecutions. Abstention reflects concerns peculiar to our federal system. As a general proposition, it is unseemly for two courts of competent jurisdiction to engage in a tug of war over the same case. Since the Constitution establishes the state courts as fully competent to adjudicate federal questions and to protect federal rights, federal courts should be slow to intervene where state court proceedings are clearly contemplated. Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267; Douglas v. City of Jeanette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Railroad Commission v. Pullman Co., 1941, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. Despite these considerations, the Supreme Court has clearly said, in the line of cases beginning with *Dombrowski* and including Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444, and Cameron v. Johnson, 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, that abstention is inappropriate where a statute is alleged to be facially overbroad or vague or where bad-faith prosecution is charged. This court has of course followed this directive, as Judge Thornberry has clearly noted:

"The recent Supreme Court decision, Zwickler v. Koota, 1967, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444, confirms that the district court erred in applying the doctrine of abstention. There a state anti-handbill statute was challenged as being void for 'overbreadth' and therefore violative of the first-amendment right of free speech. The lower court applied the doctrine of abstention but the Supreme Court reversed and remanded. The Court emphasized the special duty of federal courts to vindicate federal rights, especially when the challenge is that a statute on its face is repugnant to the first amendment. Id., 88 S.Ct. at 395. The Court squarely held that the abstention doctrine is inappropriate for cases in which the statute is justifiably attacked on its face for an 'overbreadth' that abridges free expression. Id., 88 S.Ct. at 396, 399." Davis v. Francois, 5 Cir. 1968, 395 F. 2d 730, 732.

See also Moreno v. Henckel, 5 Cir. 1970, 431 F.2d 1299; Wright v. City of Montgomery, 5 Cir. 1969, 406 F.2d 867; Hunter v. Allen, 5 Cir. 1970, 422 F.2d 1158.

■ Nevertheless, defendants seem to argue that *Dombrowski* and its progeny are distinguishable once state proceedings are pending as they are in the present case.[4] They apparently base their argument on the federal anti-injunction statute, 28 U.S.C.A. § 2283,[5] which they claim compels deference to the municipal court proceedings in the

---

4. In *Dombrowski* the Court considered only the doctrine of abstention, for it held that the federal anti-injunction statute cited in note 5 infra did not apply to state prosecutions that arise *after* the filing of a federal complaint in the district court. The Court stated:

"This statute [2283] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted. * * * Since the grand jury was not convened and indictments were not obtained until after the filing of the complaint, which sought interlocutory as well as permanent relief, no state 'proceedings' were pending within the in-

tendment of 2283." Dombrowski v. Pfister, *supra*, 380 U.S. at 484 n. 2, 85 S.Ct. at 1119.

See also Stein v. Batchelor, N.D.Tex., 300 F.Supp. 602, prob. juris. noted, 1969, 396 U.S. 954, 90 S.Ct. 428, 24 L.Ed.2d 419, argued sub nom. Dyson v. Stein, 1970, 397 U.S. 982, 90 S.Ct. 1111, 25 L.Ed.2d 392.

5. 28 U.S.C.A. § 2283 (1964) provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

present case. We do not agree with this interpretation of the statute.

It is true that § 2283 reflects a concern that once state proceedings are pending the state interest increases and the possibility of federal-state friction magnifies. See Wilson v. Simon, N.D.Ill. 1969, 299 F.Supp. 305, 312. While we do not now decide whether or not an injunction is here issuable against the pending municipal proceedings under one of the exceptions to § 2283,[6] we do hold that we must at least consider plaintiffs' request for *declaratory* relief. Although a declaratory judgment clearly carries the potential for some interference with orderly state proceedings and thus invokes some of the policies expressed in § 2283,[7] the Supreme Court's decision in Zwickler v. Koota, *supra*, instructs us that the evils of tolerating overbreadth outweigh this discord and justify honoring plaintiffs' choice of a federal forum. While *Zwickler* itself involved only threatened state prosecution,[8] its language is not so limited:

"*Dombrowski* teaches that the questions of abstention and of injunctive

6. We do not resolve this issue since we find that declaratory relief is available and since we anticipate that the municipality will honor our determination. Only if the district court on remand concludes that an injunction against the pending municipal prosecutions will be necessary to effectuate our judgment will the court be forced to determine its permissibility.

We do note that the availability of an injunction in an overbreadth case against pending state proceedings is currently unresolved. Although this court has held that § 2283 simply codifies a policy of judicial comity which must yield in the face of an overbreadth challenge, e. g., Sheridan v. Garrison, 5 Cir., 415 F.2d 699, cert. denied, 1970, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed.2d 685; Machesky v. Bizzell, 5 Cir. 1969, 414 F.2d 283, the Supreme Court, in a case not grounded upon facial invalidity, recently ruled that a comity-theory could not be ingrafted upon the explicit exceptions set forth in the statute. Atlantic Coast Line R. R. v. Brotherhood of Locomotive Engineers, 1970, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (" * * * a federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear. * * This conclusion is required because Congress itself set forth the only exceptions to the statute, and those exceptions do not include this situation").

Despite the decision in *Atlantic Coast Line R. R.*, it still might be contended that section one of the Civil Rights Act of 1871, 42 U.S.C.A. § 1983 (1964), one of the jurisdictional bases of the present suit, is an exception to the prohibition of § 2283 "expressly authorized by Act of Congress." The Supreme Court has explicitly left this question open, Cameron v. Johnson, *supra*, 390 U.S. at 613 n. 3, 88 S.Ct. 1335; Dombrowski v. Pfister, *supra*, 380 U.S. at 484 n. 2, 85 S.Ct. 1116, and the lower courts are currently divided over the issue. Compare Cooper v. Hutchinson, 3 Cir. 1950, 184 F.2d 119, 124 & n. 11; Landry v. Daley, N.D.Ill., 288 F.Supp. 200, appeal dismissed, 1968, 393 U.S. 220, 89 S.Ct. 455, 21 L.Ed.2d 392, with Baines v. City of Danville, 4 Cir. 1964, 337 F.2d 579, cert. denied, 1965, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702. See generally Sheridan v. Garrison, *supra*, 415 F.2d at 704; Machesky v. Bizzell, *supra*, 414 F.2d at 287. This question is now before the Supreme Court, Fernandez v. Mackell, S.D.N.Y., 288 F.Supp. 348, prob. juris. noted, 1968, 393 U.S. 975, 89 S.Ct. 453, 21 L.Ed.2d 437; Samuels v. Mackell, S.D.N.Y., 288 F.Supp. 348, prob. juris. noted, 1968, 393 U.S. 975, 89 S.Ct. 453, 21 L.Ed.2d 437; Harris v. Younger, C.D.Cal.1968, 281 F. Supp. 507, prob. juris. noted, 1969, 393 U.S. 1013, 89 S.Ct. 611, 21 L.Ed.2d 558.

Since no prosecutions are currently pending under Section 14–11 of the Mobile ordinances, there is no question about the availability of injunctive relief against future action under that ordinance. Stein v. Batchelor, *supra*.

7. See, e. g., Brooks v. Briley, M.D.Tenn. 1967, 274 F.Supp. 538, 553 (three-judge court) (Section 2283 "cannot be avoided by seeking a declaratory judgment") (alternative holding), aff'd per curiam on other grounds, 1968, 391 U.S. 361, 88 S.Ct. 1671, 20 L.Ed.2d 647.

8. Note, The Federal Anti-Injunction Statute and Declaratory Judgments in Constitutional Litigation, 83 Harv.L.Rev. 1870, 1877–78 n. 38 (1970).

940

relief are not the same. * * * We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction." *Id.* at 254, 88 S.Ct. at 399.

Subsequent cases in this circuit have recognized the availability of declaratory relief despite the pendency of state proceedings. Stein v. Batchelor, *supra;* Malone v. Emmet, M.D.Ala.1967, 278 F. Supp. 193, 200; see Davis v. Francois, *supra,* 395 F.2d at 737 & n. 13.

### III.

■ Having determined that we not only may but should examine each of the questioned ordinances for constitutional invalidity we now undertake such an examination. In doing so it is appropriate to emphasize what should need no citation. Government, be it federal, state, or municipal, has a definite, legitimate interest in regulating demonstrations however laudatory their purpose. Only when regulations unduly infringe protected expressive activity are we empowered to intervene and insist upon more carefully tailored legislation. See Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. Cox v. Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, contains perhaps the clearest articulation of this principle, and we therefore quote from the language of the Court:

"The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discrimina-

tory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. * * Governmental authorities have the duty and responsibility to keep their streets open and available for movement. * * *

"We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech."

*Id.* at 554–555, 85 S.Ct. at 464–465.

Proceeding to an evaluation of the questioned ordinances, we deal with each separately.

■ *A. Section 14–11, Prohibiting More than Six Persons From Demonstrating Before the Same Place of Business or Public Facility*

Section 14–11 provides:

"Those who participate in any demonstration on any sidewalk shall be spaced a distance of not less than ten feet apart; and not more than six persons shall demonstrate at any one time before the same place of business or public facility."

While, as we have noted, the City of Mobile is not proscribed from imposing restrictions on demonstrations, we feel that the facial invalidity of this ordinance is manifest in light of this court's recent decision in Davis v. Francois, *supra.* There we held invalid on its face for overbreadth a Port Allen, Louisiana, ordinance which limited to two the number of persons who could lawfully picket at one time in front of a residence, a place of business, or a public building. The provision in the Mobile ordinance for four additional pickets does not render inap-

posite the conclusions we reached in *Davis*:[9]

"It should be evident from this discussion that the question presented by the Port Allen ordinance is not whether the city has the power to regulate demonstrations but whether the means chosen to achieve a legitimate end are so sweeping that fundamental personal liberties are stifled. * * * This Circuit has approached this problem by asking whether the state control 'is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with the resort to public places.' Guyot v. Pierce, supra 372 F.2d [658] at 661. We have also said that 'these rights to picket and to march and to assemble are not to be abridged by arrest or other interferences so long as asserted within the limits of not unreasonably interfering with the right of others to use the sidewalks and streets, to have access to store entrances, and where conducted in such a manner as not to deprive the public of police and fire protection.' See Kelly v. Page, supra, 335 F.2d [114] at 119.

"The present ordinance patently violates these precepts. Its application is sweeping: It restricts 'public issue picketing' and private picketing; it restricts picketing on both the sidewalks and streets; it extends to all kinds of facilities in the city though each may present different considerations; it absolutely limits the number of picketers to two regardless of the time, place or circumstances. In so doing it 'unduly restricts the right to protest' because it does not aim specifically at a serious encroachment on a state interest or evince any attempt to balance the individual's right to effective communication and the state's interest in peace and harmony. See Thornhill v. Alabama, supra; Carlson v. People of State of California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104. Thus, this ordinance is not the narrowly drawn regulation that properly restricts the time, place, or manner of the protests. Indeed, it considers only the number of demonstrators and gives no relevance to other factors. Limiting the number to two persons, regardless of the time, place and circumstances, is especially restrictive when coupled with the fact that the ordinance covers all kinds of buildings. It takes little imagination to see that two picketers before some buildings would be useless. Since the right to freedom of speech contemplates effective communication, this statute denies demonstrators many meaningful methods of expression. See Saia v. People of State of New York, 1948, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574. Moreover, the statute confines the number of protesters to two at any building without indicating that any more would necessarily cause riots, block the streets, sidewalks, or entrances to the buildings. These limitations are unreasonable because there is no legitimate state interest demanding that there never be more than two persons picketing or demonstrating at any of these places. Consequently, in attaining a permissible end, the city has exercised its power in a way that unduly infringes on protected freedom by allowing punishment for the fair exercise of first-amendment rights. See Edwards v. South Carolina, [372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697,] supra. Thus under the guise of regulating conduct reachable by the police power it has permitted punishment for the expression of unpopular views. See Thornhill v. State of Alabama, supra; Guyot v. Pierce, supra [372 F.2d] at

---

9. The overly restrictive nature of this ordinance becomes manifest when it is noted that recent Interior Department regulations, which limit the number of persons who may demonstrate in front of the White House, set 100 demonstrators as the maximum number consistent with the safety of the President. See The Washington Post, Oct. 6, 1970, § C, col. 7, at 1.

662; Cottonreader v. Johnson, M.D. Ala.1966, 252 F.Supp. 492, 497." Davis v. Francois, *supra,* 395 F.2d at 734–36 (footnotes omitted). Cf. In Re Wright, M.D.Ala.1965, 251 F.Supp. 880 (identical ordinance held invalid as applied).

■ *B. Section 14–13, Failing to Disperse from an Unlawful Assembly*

Section 14–13 provides:

"Any person comprising a part of any unlawful assembly on any street or any public place who, after being duly commanded to disperse as provided by section 14–12, willfully and intentionally fails to do so shall, upon conviction, be punished as provided in section 1–4."

Section 14–1 purports to chart our course as to what constitutes an "unlawful assembly," but it is far from the end of our journey. Thus, section 14–1 tells us that an unlawful assembly comprises the following:

"Unlawful assembly. An assembly which is unlawful according to the common law of England, or section 407, Title 14, Code of Alabama, as amended, or any other state act or statute."

Our first stop on this three-pronged path is section 407, Title 14, Code of Alabama, as amended, which declares unlawful:

"two or more persons [who] meet together to commit a breach of the peace, or to do any other unlawful act. * *"

While assembly of two or more persons to commit a "breach of the peace, or to do any other unlawful act" certainly raises potential issues of overbreadth and vagueness,[10] we do not find it necessary to reconsider the decision of the three-judge court in Devine v. Wood, M.D.Ala. 1968, 286 F.Supp. 102, which held that section 407 was facially valid in light of Alabama judicial limitations. Despite the possible validity of section 407 the remaining two standards in this three-tiered scheme are so vague and overbroad as to compel us to find the entire Mobile ordinance unconstitutional on its face.

Reference to the common law of England would seem to lead us to the common law definition of unlawful assembly which encompasses an assembly of persons "to carry out a lawful or unlawful purpose in such a manner as is likely to produce danger to the tranquility and peace of the neighborhood." 91 C.J.S. Unlawful Assembly § 1; see Reg. v. Graham, 1880, 16 Cox Crim.Cas. 420; Reg. v. Vincent, 9 Car. & P. 91. We are unable to distinguish this definition from the content of the breach of the peace ordinance declared invalid in Edwards v. South Carolina, *supra.* That ordinance was construed to mean:

"'[A] violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence * * *, it includes any violation of any law enacted to preserve peace and good order. * * * It is not necessary that the peace be actually

---

10. A brief examination of some of the cases construing similar statutes and ordinances reveals the fine distinctions courts have drawn. In Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, and Cox v. Louisiana, *supra,* the Supreme Court held that "breach of the peace" statutes considered in those cases were facially unconstitutional with regard to street demonstrations, *cf.* Brown v. Louisiana, 1966, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637. However, in Wright v. City of Montgomery, *supra,* we sustained the facial constitutionality of a similar ordinance of Montgomery, Alabama, on the ground that Alabama courts had limited the offense to "violent or menacing conduct or conduct which tends to provoke menacing and violent conduct." In Landry v. Daley, *supra,* a three-judge district court held that an Illinois "mob action" statute proscribing an assembly of two or more persons to do an "unlawful act" was unconstitutionally overbroad and vague, while a three-judge court in Rollins v. Shannon, E.D.Mo.1968, 292 F. Supp. 580, upheld the facial constitutionality of a Missouri statute which covered an "unlawful act, with force or violence, against the person or property of another, or against the peace or to the terror of the people, * * *"

broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense. * * *

" 'By "peace" as used in the law in this connection, is meant the tranquility enjoyed by citizens of a municipality or community where good order reigns among its members * * *.' "

The Supreme Court found this ordinance facially invalid because it could be construed "to make criminal the peaceful expression of unpopular views." 372 U.S. at 237, 83 S.Ct. at 684. We find the same vice in the Mobile ordinance.

Moreover, a cursory review limited to the Alabama criminal statutes which might be encompassed by "an assembly which is unlawful according to * * * any other state act or statute" reveals several enactments which themselves are of dubious validity.[11] We feel that Mobile has simply not closely confined the effect of its ordinance to the particular evil which it desires to regulate. As we stated in Davis v. Francois, *supra*, 395 F.2d at 736, "We emphasize again that our holding does not mean the city is powerless to regulate demonstrations. It must simply identify a substantial interest worthy of protection." Mobile, in section 14–13, has failed to meet this standard; the result is a scheme which not only "chills" protected expressive activity, but which leaves too much discretion in the enforcers to censor unpopular views.[12]

In addition, we feel that this confusing scheme of varying paths to illegality is

---

[11]. For example, Ala.Code Ann. tit. 14, § 407(1), provides:

"*Outraging assembly resulting in riot or breach of peace; aiding and abetting* —1. Whoever, after having done anything to induce the assembling of a crowd, or, after having given or knowingly permitted to be given notice or public knowledge that he, or any other person, would. at a time or place certain in this state, do, aid, or assist in doing any act or make any gestures or communications which are calculated to or will probably so outrage the sense of decency and morals or so violate or transgress the customs, pattern of life and habits of the people of Alabama as to be likely to cause a riot or breach of the peace at such time or place. and does in fact do or aid or assist in doing any such act, or gestures, or communications, shall be guilty of a misdemeanor and upon conviction shall be fined a sum not exceeding three hundred dollars and may also be imprisoned for a period of not exceeding six months."

While we do not have the benefit of any Alabama judicial interpretation, it is readily apparent that this section could be construed to proscribe the expression of views which merely irritate or anger others, a result plainly untenable. See Edwards v. South Carolina, *supra*; Terminiello v. City of Chicago, 1949. 337 U.S. 1, 69 S.Ct. 894. 93 L.Ed. 1131.
Ala.Code Ann. tit. 14, § 21, declares:

"*Assemblages of anarchists*—Whenever two or more persons assemble for the purpose of advocating or teaching the doctrine of criminal anarchy, as defined in section 19 of this title, such an assembly is unlawful, and every person voluntarily participating therein by his presence, aid or instigation, shall be punished * * *."
Without belaboring the point, such a statute clearly raises First Amendment issues. See Scales v. United States. 1961, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782; Noto v. United States, 1961, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836; *cf.* United States v. Robel, 1967, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508; Aptheker v. Secretary of State, *supra*.

[12]. Perhaps the clearest expression of this particular vice of overbroad and vague laws is found in Mr. Justice Brennan's concurring opinion in United States v. Robel, *supra*. 389 U.S. at 276. 88 S.Ct. at 430:

"Formulation of policy is a legislature's primary responsibility. entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policymaking function is passed on to other agencies. often not answerable or responsive in the same degree * * *."
See also Shuttlesworth v. City of Birmingham, 1965, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176.

susceptible to the same admonishment found in Keyishian v. Board of Regents, 1967, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629, 641, where the Supreme Court noted that the vagueness of the regulatory scheme there considered was "aggravated by prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules." It is simply inconceivable to us that one acting in good faith under this Mobile ordinance would readily know what conduct was prohibited and what conduct was permitted. The language of the three-judge court in Broughton v. Brewer, N.D.Ala.1969, 298 F.Supp. 260 (Rives, J.), is particularly relevant, for it relates Alabama criminal procedures to a vagrancy statute containing many of these same vices. In finding the vagrancy statute overbroad and vague, the court stated:

"For several reasons, we conclude that section 437 cannot be construed alone or, for that matter, only in light of State court interpretations narrowing its application. Cf. Wright v. City of Montgomery, 5 Cir. 1969, 406 F.2d 867 [Jan. 27, 1969]. Alabama criminal procedure must also be taken into consideration.

"First, we note that the definition of a 'vagrant' is used disjunctively, i. e., a person merely falling within the scope of but one of thirteen subsections in section 437 may be found guilty of the criminal offense. Brannon v. State, 1917, 16 Ala.App. 259, 76 So. 991. Second, a complaint is sufficient, under current Alabama procedure, if it simply charges that 'A.B. is a vagrant.' See note 6, supra. Third, we note that proof of vagrancy need only be adduced at trial under any one of the thirteen subsections under which the State chooses to prosecute. Flandell v. State, 1944, 31 Ala.App. 520, 19 So.2d 401. Fourth, Alabama criminal procedure does not provide an accused with a right to a bill of particulars whereby he may narrow the application of section 437 to the precise sub-sections to be applied against him. See note 6, supra. Collier v. State, 1918, 16 Ala.App. 425, 78 So. 419.

"In light of the interaction of the substantive statutory offense and Alabama criminal procedure, we find it necessary to consider but one of the numerous constitutional challenges to the statute, alleged by plaintiffs in both cases.

"We hold and declare that section 437 of Tit. 14, Code of Alabama, 1940 in its entirety, when considered with applicable Alabama criminal procedural law, is so vague that it violates the fair notice requirements of due process guaranteed by the Fourteenth Amendment to the Constitution of the United States, and is unconstitutional and void." Id. at 271 (footnotes omitted).

We therefore hold that section 14–13 of the Mobile ordinance is unconstitutional on its face and consequently void.

*C. Section 14–051, Permit for Parades and Other Uses of Public Places*

In relevant part, section 14–051 provides that it shall be unlawful to engage in a "parade" without first obtaining a permit from the City Commission. "Parade" is defined in section 14–055 as follows:

"(3) 'Parade' is any formal public procession, march, ceremony, show, exhibition, pageant, or a group of persons or of vehicles containing persons moving onward in an orderly, ceremonious, or solemn procession, or any similar display in or upon any street, park or other public place in the City."

Application for a parade permit "shall be filed with the City Clerk not less than ten (10) days nor more than thirty (30) days before the date on which it is proposed to conduct the parade" unless, "for good cause," a time waiver is granted. The City Commission must issue a permit if it finds the following:

"(1) The conduct of the parade will not substantially interrupt the safe and orderly movement of other traffic contiguous to its route.

(2) The conduct of the parade will not require the diversion of so great a number of police officers of the City to properly police the line of movement and the areas contiguous thereto as to prevent normal police protection to the City;

(3) The conduct of such parade will not require the diversion of so great a number of ambulances as to prevent normal ambulance service to portions of the City other than that to be occupied by the proposed line of march and areas contiguous thereto;

(4) The concentration of persons, animals and vehicles at assembly points of the parade will not unduly interfere with proper fire and police protection of, or ambulance service to, areas contigious to such assembly areas;

(5) The conduct of such parade will not interfere with the movement of fire-fighting equipment enroute to a fire;

(6) The conduct of the parade is not reasonably likely to cause injury to persons or property, to provoke disorderly conduct or create a disturbance;"

The City of Mobile should be commended for its attempt to specify standards for the issuance of permits. This ordinance is a far cry from the permit ordinances considered in other cases where the courts have found no standards for issuance.[13] See Kunz v. New York, *supra;* Guyot v. Pierce, 5 Cir. 1967, 372 F.2d 658; Baker v. Bindner, W.D.Ky. 1967, 274 F.Supp. 658 (three-judge court); *cf.* Cox v. New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049.

Plaintiffs argue, however, that even if the standards in this ordinance are sufficiently explicit, the definition given to "parade" sweeps too broadly in that a wide-range of protected activity is subject to the licensing scheme. The ordinance is not limited to "parades" as we usually conceive of them—large processions on the streets or sidewalks. Nor is it restricted to those activities which are likely to obstruct traffic or be disruptive of other legitimate state interests. See Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773, 1784 (1967). While we feel that this argument has some merit, we may not invalidate the ordinance on its substantive sweep. In Shuttlesworth v. City of Birmingham, 1969, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162, the Supreme Court assumed that with proper standards for issuance, a licensing scheme imposed upon all "public demonstrations" on the "public way" would be facially constitutional.

Even though a licensing scheme may save an ordinance which affects speech by providing a "penalty-free" review which is not available when the arresting officer or prosecutor is vested with the authority to make the initial determination of whether or not conduct is privileged, Note, The First

13. We note in passing, however, that standard number six, providing that a permit shall issue only if the Commission determines that "the conduct of the parade is not reasonably likely to cause injury to persons or property, to provoke disorderly conduct or create a disturbance," raises overbreadth and vagueness problems. See, *e. g.,* University Comm. to End the War in Viet Nam v. Gunn, W.D.Tex.1968, 289 F.Supp. 469 (3-judge court) (per curiam), appeal dismissed, 1970, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684; Baker v. Bindner, *supra;* Carmichael v. Allen, *supra; cf.* Hunter v. Allen, *supra.* The vice of course is that such a standard may be susceptible to an interpretation which would result in the denial of a permit because the ideas expressed by the demonstrators "disturb" members of the community. New or different ideas are often "disturbing," but we should be no less willing to protect their expression absent provocation to violence. See Hunter v. Allen, *supra.* See generally Edwards v. South Carolina, *supra;* Terminiello v. City of Chicago, *supra.* Nevertheless, since we find an even more fundamental flaw in the Mobile permit-granting scheme, we do not decide whether standard six renders the ordinance unconstitutional.

Amendment Overbreadth Doctrine, *supra*, at 855; see Poulos v. New Hampshire, 1953, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105, the licensing procedures, if slow, cumbersome, or onerous, may "chill" privileged expressive activity just as would a substantively overbroad law. The possibility that one might successfully defend when charged with a failure to secure a license when the conduct is privileged, see Smith v. City of Montgomery, M.D.Ala.1966, 251 F.Supp. 849, no more excises this deterrent effect than does this same possibility under a substantively overbroad law. See generally Monaghan, First Amendment "Due Process", 83 Harv.L.Rev. 518 (1970); Note, The First Amendment Overbreadth Doctrine, *supra*, at 924–25.

In the obscenity area, the Supreme Court has recognized this fact and articulated certain procedural requisites necessary to validate a prior screening scheme. In Freedman v. Maryland, 1965, 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–739, 13 L.Ed.2d 649, 654–655, the Court stated:

> "Applying the settled rule of our cases, we hold that a noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system. First, the burden of proving that the film is unprotected expression must rest on the censor. As we said in Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed. 2d 1460, 'Where the transcendant value of speech is involved, due process certainly requires * * * that the State bear the burden of persuasion to show that the appellants engaged in criminal speech.' Second, while the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression. The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint. * * * To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. Moreover, we are well aware that, even after expiration of a temporary restraint, an administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. See Bantam Books, Inc. v. Sullivan, [372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584]. Therefore, the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license."

While *Freedman* dealt with submission of motion pictures, its principles would seem equally applicable with regard to the licensing of demonstrations. Indeed, the need for procedural safeguards may be even greater. As Mr. Justice Harlan expressed the matter in his concurring opinion in *Shuttlesworth*:

> "It may be suggested, however, that Shuttlesworth's dilemma was of his own making. He could have requested a permit months in advance of Good Friday, thereby allowing Alabama's administrative and judicial machinery the necessary time to operate fully before the date set for the march. But such a suggestion ignores the principle established in Freedman v. Maryland, 380 U.S. 51, 58–61, 85 S.Ct. 734, 738–741, 13 L.Ed.2d 649, 654, 655, 656 (1965), which prohibits the States

from requiring persons to invoke unduly cumbersome and time-consuming procedures before they may exercise their constitutional right of expression. Freedman holds that if the State is to protect the public from obscene movies, it must afford exhibitors a speedy administrative or judicial right of review, lest "the victorious exhibitor might find the most propitious opportunity for exhibition [passed]." Id., at 61, 85 S.Ct. at 740, 13 L.Ed.2d at 656. The Freedman principle is applicable here. The right to assemble peaceably to voice political protest is at least as basic as the right to exhibit a motion picture which may have some aesthetic value. Moreover, slow-moving procedures have a much more severe impact in the instant case than they had in Freedman. Though a movie exhibitor might suffer some financial loss if he were obliged to wait for a year or two while the administrative and judicial mills ground out a result, it is nevertheless quite likely that the public would ultimately see the film. In contrast, timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all. To require Shuttlesworth to submit his parade permit application months in advance would place a severe burden upon the exercise of his constitutionally protected rights. Cf. Williams v. Rhodes, 393 U.S. 23, 33, 89 S.Ct. 5, 11, 21 L.Ed.2d 24, 32 (1968).

I do not mean to suggest that a State or city may not reasonably require that parade permit applications be submitted early enough to allow the authorities and the judiciary to determine whether the parade proposal is consistent with the important interests respecting the use of the streets which local authority may legitimately protect. But such applications must be handled on an expedited basis so that rights of political expression will not be lost in a maze of cumbersome and slow-moving procedures."

Shuttlesworth v. City of Birmingham, supra, 394 U.S. at 162–163, 89 S.Ct. at 944–945 (footnote omitted).

A majority of the Supreme Court has yet to delineate explicitly the relevance of *Freedman* to the permit-granting process, Monaghan, *supra*, at 541, but the majority in *Shuttlesworth* seemed to assume that in general *Freedman* would apply. The Court stated in a footnote that whether the state court's interpretation which had articulated standards for issuance had validated the scheme "would depend upon, among other things, the availability of expeditious judicial review of the Commission's refusal of a permit." Shuttlesworth v. City of Birmingham, *supra*, 394 U.S. at 155 n. 4, 89 S.Ct. at 941. The Court then referred to *Freedman* and the concurring opinion of Mr. Justice Harlan, quoted above, which was cast entirely in terms of *Freedman*. Moreover, in discussing an ex parte state restraining order issued against a political rally in Princess Anne, Maryland, the Supreme Court made the following comments in Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 351–352, 21 L.Ed.2d 325, 331:

"The Court has emphasized that '[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' Bantam Books [Inc.] v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593 (1963); Freedman v. Maryland, 380 U.S. 51, 57, 85 S.Ct. 734, 738, 13 L.Ed. 2d 649, 654 (1965). And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. [State of] Maryland, supra, at 58, 85 S.Ct. at 739, 13 L.Ed.2d at 654, a noncriminal process

of prior restraints upon expression 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'

"Measured against these standards, it is clear that the 10-day restraining order in the present case, issued ex parte, without formal or informal notice to the petitioners or any effort to advise them of the proceeding, cannot be sustained. Cf. Marcus v. Search Warrant, 367 U.S. 717, 731, 81 S.Ct. 1708, 6 L.Ed.2d 1127, 1135 (1961); A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 * * *."

■ We think that in general *Freedman* should apply to the Mobile permit-granting ordinance and that the ordinance is invalid under that case. Section 14-051 makes no provision for prompt, Commission-initiated judicial review. Even in A Quaker Action Group v. Hickel, 1969, 137 U.S.App.D.C. 176, 421 F.2d 1111, where a 15-day notice provision for demonstrations in front of the White House was found reasonable because of the peculiar need to protect the President, the court stipulated that if the Government wished to bar demonstrations, it would be incumbent upon it to seek an injunction through the judicial process. The present scheme not only lacks the compelling circumstances found in *A Quaker Action Group* but also wants the accompanying safeguards. The situation is accentuated by the sweeping definition of "parade". In declaring invalid as applied a provision of a parade ordinance that required advance notice to the city of *any* march the court in Robinson v. Coopwood, N.D. Miss.1968, 292 F.Supp. 926, aff'd, 5 Cir. 1969, 415 F.2d 1377, stated:

"The exercise of the rights of free speech and free assembly cannot be made a crime, nor may those who seek to freely exercise those rights be criminally punished for failure to previously register their intentions with law enforcement officers, in absence of a situation involving clear and present violence, or threat thereof. Advance notice is impossible where the demonstration results from a spontaneous group desire, and, even where there is sufficient time to give the requisite notice, the requirement necessarily destroys the feeling of security from official restraint and deters potential marchers from participating. In short, the administration of a dosage of 'preventive medicine' is impermissible in connection with First Amendment rights. These rights are susceptible of restriction 'only to prevent grave and immediate danger to [an interest] which the State may lawfully protect.' West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628, 1638, 147 A.L.R. 674." *Id.* at 934.

See also Smith v. City of Montgomery, *supra*. Therefore, we hold that section 14-051 is void on its face.

D. *Section 14-7, Making Unlawful Obstructing Free Passage of Streets and Other Public Places*

Section 14-7 provides:

"It shall be unlawful for any person to stand, loiter, walk or run upon any street, park, public place or any portion of private property which has been set aside by the owner thereof for the use of customer vehicular travel or parking, so as to obstruct free passage thereon by other persons."

■ It cannot be denied that Mobile has a legitimate interest in providing free passage over its public ways. We feel that recent decisions both by the Supreme Court and by this court preclude any determination that section 14-7 is facially unconstitutional. In Shuttlesworth v. City of Birmingham, 1965, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176, the Supreme Court had before it a "loitering" ordinance which Alabama courts had interpreted to apply "only when a person who stands, loiters, or walks on a street

or sidewalk so as to obstruct free passage refuses to obey a request by an officer to move on." The Court held the ordinance valid on its face:

"As so construed, we cannot say that the ordinance is unconstitutional though it requires no great feat of imagination to envisage situations in which such an ordinance might be unconstitutionally applied." *Id.* at 91, 86 S.Ct. at 214.

We have reached the same conclusion after examining similar legislation. Hunter v. Allen, *supra*; Wright v. City of Montgomery, *supra.* See also Bachellar v. Maryland, 1970, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570. Section 14–7, which limits itself to obstructive conduct, is therefore not facially overbroad.

■ Plaintiffs admit the persuasiveness of these precedents, but argue that the Mobile ordinance is invalid for failure to limit itself to "intentional" obstruction. That is, plaintiffs argue that since the ordinance neither provides for prior warning by a police officer nor explicitly requires a knowing violation, it is facially unconstitutional. We disagree. While it is true that some overbreadth opinions have mentioned the constitutional problems inherent in a statute which punishes unknowing, innocuous conduct, see Landry v. Daley, *supra*, 280 F.Supp. at 953, we think plaintiffs' argument may not be directed to the facial validity of the ordinance but should be raised when the ordinance is applied to their particular conduct. Since "obstruction" has been held to be a sufficiently explicit standard to cure overbreadth, we do not see how the potential for application to unintentional obstructive conduct "chills" primary expressive activity and thus necessitates facial review. Plaintiffs' argument is instead directed to the unfairness of punishing unknowing obstuction, but this due process argument, see, *e. g.*, Lambert v. California, 1957, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228, is not one we should consider in judging facial constitutionality. Moreover, if the lack of a requirement of "intent" is the sole source of overbreadth in this ordinance, we feel that this is one of those rare cases where the ordinance is "within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution." Dombrowski v. Pfister, *supra*, 380 U.S. at 491, 85 S.Ct. at 1123. See generally United States v. Mancuso, 2 Cir. 1970, 420 F.2d 556.

For all of these reasons we find section 14–7 of the Mobile ordinance valid on its face.

### IV.

Summarizing our conclusions, we have declared that sections 14–11, 14–13, and 14–051 of the Mobile City Code are facially unconstitutional. We have also found that section 14–7, as written, is constitutionally valid. We now turn to a consideration of the remaining issues in this case.

Plaintiffs argue that even if section 14–7 is facially valid, it is unconstitutional as applied to their conduct since that conduct is privileged under the First Amendment. Plaintiffs therefore seek a declaration of invalidity and an injunction restraining prosecution under this section. Plaintiffs further argue that they and the members of their class are entitled to a protective injunction against prosecutions under any and all ordinances of the City of Mobile and against other repressive actions by defendants on the ground that defendants are prosecuting and threatening prosecution of plaintiffs and the members of their class in bad faith for the purpose of discouraging the exercise of their First Amendment rights. After finding all of the challenged ordinances at issue in this case facially constitutional, the court below considered these further contentions and rejected them. The district court, over plaintiffs' objection, refused to hold an evidentiary hearing; on the basis of affidavits, the court determined that the facts were not in dispute, declined to issue a preliminary injunction, and dismissed the complaint. In effect, the court granted a summary judgment in fa-

vor of defendants. See Progress Dev. Corp. v. Mitchell, 7 Cir. 1961, 286 F.2d 222, 233; cf. 7 J.Moore, Federal Practice ¶ 65.04 [3], at 1636–41 (2d ed. 1964). This was error.

■ As we have too often been called upon to say, summary judgment is appropriate only where there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Sheridan v. Garrison, supra, 415 F.2d at 708–709. We think this standard has clearly not been met in the case at hand. A reading of the record reveals a plethora of charges and countercharges, allegations and denials. While we can piece together a bare-boned outline of the events that transpired, this emaciated and skeletonized account sheds no light on the proper inferences to be drawn. Cases involving serious and challenging constitutional issues must receive full judicial scrutiny. Summary disposition of this case was within neither the tenor, the spirit, nor the actuating mandate of this court and the Supreme Court. The state of this record brings to mind a recent admonition of this court:

> "In considering a motion for summary judgment, the trial court must determine whether a genuine issue of material fact exists rather than how that issue should be resolved, and a summary judgment should be granted only when the truth is clear. Lighting Fixture & Elec. Sup. Co. v. Continental Ins. Co., 5 Cir., 1969, 420 F.2d 1211, 1213; United States v. Burket, 5 Cir., 1968, 402 F.2d 426, 430. Even though the basic facts are undisputed, a summary judgment may be improper if the parties disagree regarding the material factual inferences that properly may be drawn from these facts. See, e. g., N. L. R. B. v. Smith Industries, Inc., 5 Cir., 1968, 403 F.2d 889, 893; Keating v. Jones Development of Missouri, Inc., 5 Cir., 1968, 398 F.2d 1011, 1013."

Cole v. Chevron Chemical Co., 5 Cir. 1970, 427 F.2d 390, 393. While plaintiffs may face a heavy burden in sustaining their charge of bad faith, see Cameron v. Johnson, supra; Sheridan v. Garrison, supra, 415 F.2d at 710, we cannot say that no genuine issue of fact exists to entitle defendants to judgment as a matter of law. See Hawkins v. Green, 5 Cir. 1969, 412 F.2d 644.

We therefore conclude that this is another case which is to be added to our "mortality tables" of summary judgment, see Barber v. Motor Vessel "Blue Cat", 5 Cir. 1967, 372 F.2d 626; Keating v. Jones Development of Missouri, Inc., 5 Cir. 1968, 398 F.2d 1011, and we remand for an evidentiary hearing on the remaining issues. On remand, the district court will have to consider the following questions: (1) In light of our holding that sections 14–11, 14–13, and 14–051 are facially unconstitutional, is injunctive relief against the pending municipal proceedings both necessary and proper? See Davis v. Francois, supra. (2) Are plaintiffs' allegations of bad faith prosecution and repressive action by defendants meritorious, and if so, what relief is necessary or appropriate?

We finally take note of plaintiffs' allegation that the trial court erred in dismissing their claim with regard to mistreatment during incarceration. On this appeal plaintiffs now seem to contend that this allegation is simply evidence of bad faith conduct on the part of defendants. We feel assured that on remand the trial court will hear all relevant and admissible evidence in support of plaintiffs' claim and therefore we do not consider this issue.

For the reasons given herein, the judgment of the district court is reversed and the cause is remanded in part for an evidentiary hearing and other proceedings pursuant to this opinion.

Reversed and remanded.

GEWIN, Circuit Judge (concurring in part and dissenting in part):

In my opinion the majority is correct in remanding this case to the district court for further consideration, although

little of the case is left to consider. To that extent I concur in the remand since this is not an appropriate case for summary judgment. The development of evidence by affidavits alone is not sufficient in a case of this magnitude. When there are allegations of bad faith, irreparable injury, illegal procedure, and harassment, as well as claims to extraordinary and emergency relief, a full disclosure of the facts is essential.

It is with some regret that I find it necessary to dissent to the other conclusions reached in the majority opinion (hereafter sometimes referred to as the opinion). Not only do I have the highest regard for the author and the sincerity of his views, but also I am impressed that the position taken is argued with force and erudition. Nevertheless, I disagree with the conclusions reached, and I think it is my unavoidable duty not to surrender my own judgment in view of the national importance of the issues tendered for decision. In my judgment the opinion decides too much too quickly.

What I shall say is not intended to disparage the importance of First Amendment rights guaranteed by the Constitution. Yet in according full deference to the vital importance of the exercise of such rights, courts should keep in mind that on some occasions there are claims that activities are First Amendment expressions, when the actual facts clearly show that the actors are parading under a shield of hypocracy. In some circumstances the characterizations "peaceful protest", "peaceable assembly" and "freedom of expression" are used as an impenetrable carapace to shield violent and riotous conduct. Serious consequences which threaten the general welfare and domestic tranquility inevitably follow.

## I

In my view this case should begin and end with the application of the clear and unequivocal pronouncement by the Supreme Court in Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). It is the latest controlling and most positive decision on the subject of interference by federal courts with state court proceedings. This important decision deserves more than the footnote treatment accorded it in the majority opinion. *Atlantic Coast Line* also involved the right to picket. Indeed, it involved a federally protected right to picket under the Railway Labor Act, 45 U.S.C. 151 et seq., which Act declares that the right to picket can not be interfered with by state court injunctions. The right of laborers to picket in *Atlantic Coast Line* is at least equal to the alleged rights of the plaintiffs in this case to parade, assemble and picket. In addition, the pickets in *Atlantic Coast Line* not only had the *constitutional right* to picket as a means of expression, Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); that right was also fully recognized as a national policy by the Railway Labor Act and by a recent Supreme Court decision. Brotherhood of Railway Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).

*Atlantic Coast Line* should settle current doubts about the meaning of 28 U.S. C. 2283. Rather than undertaking to paraphrase the Court's language, I quote three excerpts from the opinion which leave no question about what the Court held:

"The respondent here has intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. In 1954 when this Court interpreted this statute, it stated: 'This is not a statute conveying a broad general policy for appropriate ad hoc application. Legislative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions.' Amalgamated Clothing Workers v. Richman Brothers, 348 U.S. 511, 515–516, 75 S.Ct.

452, 455, 99 L.Ed. 600, 607–608 (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court.

\* \* \* \* \* \*

"First, a federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear. This rule applies regardless of whether the federal court itself has jurisdiction over the controversy, or whether it is ousted from jurisdiction for the same reason that the state court is. Cf. Amalgamated Clothing Workers v. Richman Bros., supra, [348 U.S.] at 519–520, 75 S.Ct. [452] at 457–458, 99 L.Ed. at 609–610. This conclusion is required because Congress itself set forth the only exceptions to the statute, and those exceptions do not include this situation.

\* \* \* \* \* \*

Again, lower federal courts possess no power whatever to sit in direct review of state court decisions. If the union was adversely affected by the state court's decision, it was free to seek vindication of its federal right in the Florida appellate courts and ultimately, if necessary, in this Court. Similarly if, because of the Florida Circuit Court's action, the union faced the threat of immediate irreparable injury sufficient to justify an injunction under usual equitable principles, it was undoubtedly free to seek such relief from the Florida appellate courts, and might possibly in certain emergency circumstances seek such relief from this Court as well. Cf. Natural Gas Co. v. Public Serv. Comm., 294 U.S. 698, 55 S.Ct. 634, 79 L.Ed. 1235 (1935); United States v. Moscow Fire Ins. Co., 308 U.S. 542, 60 S.Ct. 129, 84 L.Ed. 456 (1939); R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court § 441 (R. Wolfson & P. Kurland ed., 1951). Unlike the Federal District Court, this Court does have potential appellate jurisdiction over federal questions raised in state court proceedings, and that broader jurisdiction allows this Court correspondingly broader authority to issue injunctions 'necessary in aid of its jurisdiction.'

This case is by no means an easy one. The arguments in support of the union's contentions are not insubstantial. But whatever doubts we may have are strongly affected by the general prohibition of § 2283. Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy. The explicit wording of § 2283 itself implies as much, and the fundamental principle of a dual system of courts leads inevitably to that conclusion."

I am compelled to disassociate myself with the circular reasoning of the majority. In my opinion it circumvents the clear mandate of § 2283 by the sugar coated assertion that it does not decide whether an injunction is issuable against the pending municipal proceedings, but then proceeds to hold "that we must at least consider plaintiffs' request for declaratory relief." Declaratory relief is granted and all but one of the ordinances are held to be null and void. It is obvious to me that the majority possesses serious and well grounded misgivings about the authority of a federal court to intrude upon, stop and nullify state court proceedings, yet it proceeds to effect the

same interference by decreeing a so called "milder form of relief."[1] Such relief, however, is as offensive to the prohibition of § 2283 as a direct injunction. An injunction interferes directly, declaratory relief indirectly; both violate the clear meaning of the statute. This two-step process nullifies the intent and purpose of § 2283 as interpreted by *Atlantic Coast Line*. Otherwise stated, the plaintiffs have now obtained a declaratory judgment which places them in a position to return to the federal court to seek a direct injunction under the exception "to protect or effectuate [a federal court's] judgments." In my view, such reasoning constitutes an unauthorized evasion of § 2283, reduces it to incoherence and nullifies its plain and unequivocal provisions. I think the logic of *Atlantic Coast Line* flatly prohibits this subterfuge.

The purpose and intent of the majority to achieve the same restraint as would be achieved by an injunction is clearly demonstrated by the statement in footnote 6 that "We do not resolve this issue [issuance of an injunction] since we find that declaratory relief is available and since we anticipate that the municipality will honor our determination." The opinion then speaks of the possible necessity of an injunction "to effectuate our judgment."

The *Atlantic Coast Line* holding does not represent an abrupt break with the past. Other Supreme Court decisions directly point to and clearly support the principles enunciated in that decision. See *e. g.*, Harrison v. NAACP, 360 U.S. 167, 176, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959); Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950); Douglas v. City of Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Great Lakes Dredge and Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Hill v. Martin, 296 U.S. 393, 56 S.Ct. 278, 80 L.Ed. 293 (1935); cf. Toucey v. New York Life Ins. Co., 314 U.S. 118, 132, 62 S.Ct. 139, 86 L.Ed. 100 (1941); City of Houston v. Standard Triumph Motor Co., 347 F.2d 194 (5th Cir. 1965). The decisions relied upon by the majority simply do not control the case at hand. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); and Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), deal chiefly with the subject of abstention and "special circumstances."

*Dombrowski* made it clear that state court proceedings had not commenced within the meaning of § 2283 when the federal court granted the relief sought. In *Cameron* the claims of vagueness, overbreadth, bad faith and harassment were ultimately rejected by the three-judge district court. On appeal the Supreme Court affirmed the decision of the lower court holding that the anti-picketing statute was valid and concluding that the record did not establish plaintiff's charges of bad faith. The facts were fully developed in *Cameron*. The Court stated:

> Federal interference with a State's good-faith administration of its criminal laws "is peculiarly inconsistent with our federal framework" and a showing of "special circumstances" beyond the injury incidental to every proceeding brought lawfully and in good faith is requisite to a finding of irreparable injury sufficient to * * injunction.

Cameron v. Johnson, 390 U.S. 611, 618, 88 S.Ct. 1335, 1339. *Zwickler* is inconclusive because it did not deal with a state prosecution actually in progress. Rather it dealt with a "threatened prosecution" in the Dombrowski-type situation. The three-judge court in *Zwickler* abstained. The case did not involve § 2283 or a pending state prosecution.

1. See Maraist, Federal Injunctive Relief against State Court Proceedings: The Significance of Dombrowski, Texas L.Rev. 1970, 535; Note, The Federal Anti-Injunction Statute and Declaratory Judgments in Constitutional Litigation, 83 Harv.L.Rev. 1870, 1877–78 n. 38 (1970).

It is interesting to note that on its second appearance, Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), the Supreme Court reversed the three-judge district court for granting a declaratory judgment, because the threat of state prosecution was not real and "a hypothetical threat is not enough." The above cited cases and numerous other decisions compel a consideration of fully developed facts; that is why this case must be remanded.

## II

The record facts before us are not so "bare-boned", "emaciated and skeletonized" that our decision must be made in a factual vacuum. Accordingly, I proceed to a consideration of certain facts which are disclosed. Without dispute the record demonstrates that the plaintiffs had paraded, picketed and protested in Mobile, Alabama, without interference, since the summer of 1968. The controversial requests for a permit to parade was filed on April 25, 1969. After full consideration it was denied and written reasons were assigned by the City Commission on April 28, 1969. The application for the permit stated that the parade was to be held between 3 o'clock p. m. and 5 o'clock p. m. on May 6, 1969, beginning at a point on Davis Avenue and ending at the Municipal Auditorium. It was a widely publicized fact that the Junior Miss Pageant was to be conducted that very evening. Because the finals were to be telecast nationally beginning at 6:30 p. m. the audience for the telecast was required to be in the Auditorium not later than 5:45 p. m. Since a large audience was expected, extremely heavy street traffic in the area was reasonably forecast for several hours prior to the performance. The Pageant had been scheduled for months.

The application for the permit stated that there would be 10,000 participants in the parade. Realizing that this additional mass of people would assemble at a time when traffic would already be congested for the Junior Miss Pageant, the City Commission assigned in writing five reasons for denying the permit: (1) interruption of the safe and orderly movement of other traffic, (2) diversion of large numbers of police officers, (3) interference with fire, police and ambulance service arising out of the concentration of a large number of persons at the assembly point, (4) the likelihood that such a large concentration of people in one area would result in disorder, injury to persons and the destruction of property, and (5) the physical limitations of the streets and public grounds in the area.

In addition to police officers, responsible city officials made sworn statements that the plaintiffs or those whom they represented had asserted that they would "tear up the town" and use "any means" to get what they wanted. These statements assert that one of the leaders who actually signed the application for the permit stated, "We have trained killers in town" and "Mobile could become another Watts or Detroit." Others asserted that there was a high degree of tension in the city on the date involved and thought that the officials were justified in feeling that there was a clear and present danger of violence and destruction. Some of these facts are disputed by the plaintiffs. The record presents conflicts between the several affidavits filed in court.

Although I do agree that the facts should be fully developed, it appears to me that the case at hand is remarkably similar to the problems presented in Brooks v. Briely, 274 F.Supp. 538 (N.D. Tenn.1967). While it is true that violence had already developed in Brooks, substantially the same questions which we must decide arose as to state restraint on the exercise of First Amendment rights. It was concluded that injunctive relief was not appropriate and that § 2283 should not be circumvented by the issuance of a declaratory judgment. That decision was affirmed per curiam by the Supreme Court, 391 U.S. 361, 88 S.Ct. 1671, 20 L.Ed.2d 647

(1968).[2] Moreover, it has long been settled law that courts will not anticipate constitutional questions but will wait until a case is presented which *requires* the resolution of a constitutional issue. Additionally, courts will not decide a constitutional question although properly presented if some other legitimate ground exists upon which to decide the issue. Clay v. Sun Ins. Office Ltd., 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960); Ashwander v. TVA, 297 U.S. 288, 346–347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis dissenting in part); State of Texas v. Grundstrom, 404 F.2d 644, 648 (5th Cir. 1968). By an unremitting repetition of the fear of a "chilling effect", the importance of First Amendment rights, a condemnation of abstention and other similar broad general expressions, the majority opinion evidences an avid desire to declare Mobile's ordinances facially invalid on a record which is factually deficient. Indeed, the opinion seems to seize the opportunity to pass upon constitutional issues now pending in the Supreme Court. See footnote 4 stating that probable jurisdiction has been noted in Stein v. Batchelor (N.D.Tex.) 300 F.Supp. 602, 396 U.S. 954, 90 S.Ct. 428, 24 L.Ed.2d 419, argued sub nom. Dyson v. Stein, 397 U.S. 982, 90 S.Ct. 1111, 25 L.Ed.2d 392. See also footnote 6 wherein it is observed that the relationship between § 2283 and certain civil rights statutes is now pending before the Supreme Court.

It is settled law that states have a legitimate interest in imposing reasonable restrictions on the *time, place, duration* or *manner* of permitting parades, demonstrations and picketing. Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; Wright v. City of Montgomery, 406 F.2d 867 (5th Cir. 1969). Every case involving First Amendment rights does not have to be a federal case. State courts have been accorded full competence in this area. Atlanta Coast Line v. Brotherhood of Locomotive Engineers, supra; Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

### III

In the sensitive field of state-federal relations we are not required to act timidly but we should proceed cautiously. The preamble to the Constitution does not purport to guarantee individual rights, but it does set forth what this union of states is all about. It does not limit the Bill of Rights but it does serve as a key to an interpretation of the responsibilities involved as well as the rights therein conferred and secured.

Riots and bombings which are currently taking place all over the country resulting in the destruction of church buildings, government structures, university property, statutes, monuments, and private property, often accompanied by deadly physical assault upon police officers and private citizens alike, are ominous warnings which should not be lightly considered or brushed aside. I take judicial notice of the fact that high public officials, both state and national, have been targets of unseemly conduct and actual assault by persons who claimed to be exercising First Amendment rights of free expression. Many such acts have their origin in circumstances in which some participants falsely claim that they are assembling peaceably, protesting non-violently, or, asserting their grievances in an orderly and acceptable manner. From that vantage point and that strategic position they move into destructive action and criminal anarchy, inflicting pain, suffering and chaos on innocent and unsuspecting citizens. Contrary to the aims and purposes of the Constitution they are engaged in conduct calculated to thwart a more perfect union, destroy justice, undermine domestic tranquility, impede the common defense,

2. I can not agree with the assertion of the majority in footnote 7 that Brooks v. Briely was affirmed "on other grounds." It was flatly affirmed. Johnson v. Cameron was the only case cited.

**956**

oppose the general welfare, and to intercept the blessings of liberty now.[3]

Under our system of federalism we have declined to establish a national police force. Rather we have chosen to rely, wisely in my opinion, upon state and municipal governments for protection from lawlessness. These governments have made serious mistakes, but federal authority and power should take over only when such intrusion is unequivocally necessary. To unduly disrupt, restrain and impede local authorities in reasonable and good faith efforts to deal with apparent or threatened violence, is to decree our own demise as a well ordered and properly regulated society. We must be cautious not to permit the destruction of liberty by those who falsely pretend to act in its behalf, and who deny to others the very rights they claim to be exercising. Time and time again there is a common and constant accusation of bad faith on the part of law enforcement agencies both national and local, a claim that legitimate activity has been "chilled" in the assertion of constitutional rights, and the utterance of unsecured promises that only pure and nonviolent motives are at stake. In addition there are allegations of irreparable injury, the necessity for extraordinary, immediate and emergency relief, brutality, harassment, persecution and a demand for a wide right-of-way upon which to engage in unrestrained and unregulated conduct at once—now.

It is one thing to render a sweeping decree in the well protected and guarded chambers of a federal court, but it is quite another to decide constitutional questions down on the streets where the problems arise, when policemen are often required to act in menacing and threatening circumstances. Policemen will be helpless if we blind them to the obvious, suppress the evidence they obtain and shackle their hands in the midst of threatened trouble. They too will be "chilled" in the performance of their duty, the primary object of which is to *prevent* lawless activity, not simply to detect and punish the lawless.

Upon remand there should be a full presentation of evidence relative to the following issues: bad faith or good faith of all parties involved; whether there has been a pattern of arbitrary and capricious restraint of the plaintiffs; the existence vel non of "special circumstances" beyond the normal injury which is incidental to every prosecution, even those in good faith; a determination whether there is great and immediate danger of irreparable harm to the plaintiffs; the emergency nature of the circumstances; the standing of the plaintiffs to seek relief; and whether extraordinary relief is necessary. With a full disclosure of the relevant circumstances, the district court will then be in a position to render a proper decree denying or granting relief in accordance with recognized equitable principles.

3. The preamble asserts:
    We the people of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquillity, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.